### James M. Paul et al. v. George Ball et al.

By the will of the testator he bequeathed his real estate to sundry persons, giving certain parcels to "the family of Andrew Paul," (who was the testator's deceased brother,) and thereafter disposing of sundry sums "of money" to certain of his next of kin. The residuary clause read as follows: "The remainder of *money* I may have at the time of my decease I will and bequeath, in equal amounts, to Mrs. Hannah Wilson, Robert Wilson, Matthew Wilson, James M. Paul, and the family of Andrew Paul, deceased:" *Held*, that money meant not only the cash on hand at the time of the testator's death, but also the money due on notes, mortgages, and accounts; that it was not the intention of the testator to die intestate as to any of his effects; and that the whole *residuum* of the estate passed to these devisees: *Held*, also, that the children of Andrew Paul (six in number) took *per stirpes*, and not *per capita*, with the other persons named; and that the *residuum* was correctly divided into five shares, of which the family of Andrew Paul received one share.

Where there is doubt as to the subject and the object of a will, the court must so interpret it as to arrive at the intentions of the testator, and there can be no better rule than to examine all the dispositions.

The common-law rules of interpretation are necessarily modified by our peculiar statutes.

In adopting the common law, Texas has not adopted any English statute in aid of that system. (Paschal's Dig., Art. 978, Note 418.)

Money is a term used in a specific and also in a general and more comprehensive sense; in the latter it means wealth, the representative of commodities of all kinds.

In such a will it is a safe rule to give such an interpretation as would be in harmony with the statutes of descent and distribution and of wills. (Paschal's Dig., Arts. 3419, 3425, 5365, Notes 783, 789, 1166.)

"The family of Andrew Paul, deceased," and "the children of Andrew Paul, deceased," are convertible terms, and they take according to the statute, or in allusion thereto, as the representative of the father, the deceased brother of the testator.

Where a proper in'erpretaion of the will can be gathered from its context it would be improper to admit parol evidence of any other intention of the testator than that expressed in the writing itself.

APPEAL from Galveston. The case was tried before Hon. BENJAMIN SHROPSHIRE, one of the district judges.

James Paul was an old bachelor citizen of Texas, who acquired a large fortune. By his will he devised a large amount of real estate to his next of kin and to strangers. Among other clauses in the will was this: "Lots 1, 2, 3, 4, 5, 6, and 7, in block 506, [in the city of Galveston,] I give and bequeath to the family of Andrew Paul, deceased, to be equally divided between them." The same phrase was used in reference to the south half of block 507.

He also gave to each of several next of kin different sums "of money." The final clause of the will was in these words: "The remainder of money I may have at the time of my decease I will and bequeath, in equal amounts, to Mrs. Hannah Wilson, Robert Wilson, Matthew Wilson, James M. Paul, and the family of Andrew Paul, deceased."

The will was admitted to probate, and the executors, Balls and Quarles, entered upon their duties. The contest arose in the county court upon the application of the children and widow of Andrew Paul for their distributive shares, which, they claimed, should be for each child a sum equal to the shares of the other heirs named. The sum in controversy was $97,454 24, secured by notes and mortgages. The cash on hand at the death of Paul exceeded $50,000. The court treated the whole family of James Paul as one, entitled to a distributive share, thus construing "money" to include cash on hand at the testator's death and also the money due to the intestate. On appeal to the district court the same decree was rendered.

The points presented to the Supreme Court were, first, as to the admissibility of parol evidence to explain the will; second, as to the true meaning of the residuary clause, as

explained by the will itself. If *per stirpes*, the family of Andrew Paul were entitled to one share; if *per capita*, to six shares.

No briefs have been furnished to the *Reporter*.

LINDSAY, J.—The proper construction of the residuary clause in the will of James Paul, deceased, is brought before the court by this appeal for its determination. The language of that clause is as follows: " The remainder of money I may have at the time of my decease I will and bequeath, in · equal amounts, to Mrs. Hannah Wilson, Robert Wilson, Matthew Wilson, James M. Paul, and the family of Andrew Paul, deceased."

The decedent was an old bachelor, with quite a large estate, consisting of realty and personalty, which he devised and bequeathed by his will. . His testamentary disposition was not confined to his relations, or next of kin, but embraced . strangers also in the scope of his bounty. After various specific devises and bequests to kith and kin, the residuary clause restricted the undisposed-of residue of his estate, composed of notes, bonds, mortgages, claims for money, and cash on hand, to his relations in different degrees. These were his sister, Hannah Wilson; his nephews, Robert and Matthew Wilson, sons of his sister Hannah; his nephew, James M. Paul, a son of a living brother; John Paul; and the family of a deceased brother, Andrew Paul. His sister, Hannah Wilson, the mother of his nephews Robert and Matthew, was alive at his death, and a favored devisee and legatee under the will.

Two questions are raised in the contestation among the residuary legatees on this clause of the will.

First. Did the testator bequeath to his legatees, under the term " money," his notes, bonds, mortgages, or other claims for money, or did he die intestate as to such choses in action?

Second. Did the legatees, under this residuary clause of the will, take *per stirpes*, by stocks, or did they take *per capita*, individually, in equal amounts? That is, does a bequest, in equal amounts, made to a class or family jointly·with legatees specifically named, enable or entitle the individuals of that class or family to take equal portions with the legatees specifically named by the testator?

It so happens, in this testament, that there is some uncertainty, both in the subjects and the objects intended to be embraced in the disposition of his property by the testator. We are therefore compelled to resort to construction of the language he has used, in attempting to direct the course which his property was designed to take after his death, to arrive at a satisfactory conclusion and a correct interpretation of the intentions of the testator.

It is certainly a safe canon of interpretation, where there is a doubt either as to the subject to be disposed of or as to the object upon whom it is bestowed, to look to all parts of the will to ascertain the general scope of the testator's intention in the testamentary disposition of his property, and, when the language is ambiguous and uncertain in the special details of his will, to deduce the special from the general manifestation of the meaning and purpose of the testator; for, after all, in adopting rules of construction for wills, the design and object is to ascertain, with something like legal certainty, what was the real intention of the testator in the language which he has used in attempting to dispose of his property, so that that intention may be certainly effectuated; provided, nevertheless, that his intention be not in violation of the law nor in conflict with the public policy of the country.

The right conceded by the positive laws of the country to make a testamentary disposition of property, which the testator can no longer enjoy, would be a solemn mockery, if any mere arbitrary rules were suffered to frustrate and defeat that intention. Society, in the form of civil govern-

ments, has not only the power, but the absolute right, to withhold from each individual member of it the right to direct what course his property shall take when he is no longer capable of using and enjoying it. A simple recurrence to the foundation and origin of all private property will vindicate this eminent dominion of society and governments over it. It has been constantly exercised, too, by governments, in their various statutes of descent and distribution and in their statute of wills, which are found to exist as a part of the civil institutions of all countries, variously modified, according to their different policies. In adopting rules, therefore, for the interpretation of wills, while the common law, in countries where it is adopted, is the great fountain from which the principles of interpretation are to be drawn, yet these principles are necessarily modified by the peculiar statutory regulations and the varying policy of each particular government in which the common law is recognized. Such statutes and such policy constitute elements in the judicial mind, in establishing rules of construction, which it cannot discard, however much it may struggle to escape their trammels. The English judges, in numberless decisions, acknowledge their force and influence, especially in the interpretation of devises, in which they feel constrained to conform their judgments in such cases to the policy of the government in its peculiar tenure of landed estates. They interpret some devises of realty, in which the meaning of the testator seems doubtful, to create an estate tail, which rule of interpretation is wholly inapplicable to our system. But it clearly shows that even they who, without detracting from the distinguished jurists of other countries, may be regarded as the great expounders of the common law, compound their rules of construction of the common law, of the statutes, and of the policy of the government. Our own judicial authorities are constrained by the same moral necessities; and the rules of construction and interpretation are composed

of like elements—the common law, legislative enactments, and the policy of the government.   It is a singular fact, that, although this State has adopted the common law by express legislative enactment, yet, unlike most, if not all, of the States which have adopted the common law, we have not, as they have, also adopted all English statutes of a general nature, up to a particular period, not repugnant to or inconsistent with the constitution and laws of the state.   Hence our rules of construction and interpretation must be predicated upon the common law, upon our statutes, and upon the general policy embodied in our varied form of government.   It would be dangerous, as we think, to submit too implicitly to rules of construction founded entirely upon English jurisprudence.

In the construction and interpretation of all wills, the object should be solely the discovery of the true intent and meaning of the testator in undertaking to prescribe a disposition of his property which he desires to take effect after his decease.   At best, the rules and precedents found in the reports of cases are nothing more than aids and assistants to attain this end.   And when the analogy of cases, to be tested by a settled rule, is complete and perfect in all their facts and circumstances, the rule is not only persuasive, but it becomes authoritative, unless it shocks the moral sense and staggers the understanding of the trier.   It is rare, however, that this perfect analogy exists: and this diversity in the facts of all human transactions affords frequent illustrations of the beauty and the excellency of the common law, in relieving a conscientious court from the constraint of an abject submission to precedents, which sometimes do violence to the common understandings of both the learned and unlearned.   The intention of the testator is the paramount object to which all courts should address themselves in the interpretation of wills.   Whatever conduces to that end will be in harmony with the principles of the common law.

With these cautionary suggestions, we proceed to examine the questions raised in this controversy in their order. It is obvious, from the whole context of the will, that it was the purpose of the testator that it should speak from the death of the testator, and from no other period of time. After the usual ceremonious announcement of the reasons for making and publishing his last will and testament, in the very first clause of it he declares: "I consign my body to the dust from whence it came, and soul to God who gave it, in humble reliance for my future happiness and well being on the merits of my Lord and Saviour Jesus Christ." Certainly he did not mean that then, at the moment of making and publishing his will, he was consigning his body to the dust or his soul to God; but, translating himself in imagination to the period of his dissolution, he speaks in the present tense, and thus clearly evinces that it was his purpose his will should only speak from that moment of time. Nor is there a single utterance anywhere in the body of the will from which any fair and legitimate conclusion can be drawn that the testator himself regarded it as speaking from any other than the moment of his dissolution. There can be no question that such was his intention.

Speaking then, as it most certainly does, from the death of the testator alone, does the residuary clause, under the general term money, pass by his will the whole of his personal estate, consisting of notes, bonds, mortgages, and other securities? Money is a term used in a specific and also in a general and more comprehensive sense. In its specific sense, it means what is coined or stamped by public authority, and has its determinate value fixed by governments. In its more comprehensive and general sense, it means wealth—the representative of commodities of all kinds—of lands, and of everything that can be transferred in commerce. In construing this will, in reference to this term used in the residuary clause, we must ascertain from the general context of the will whether the testator used

it in its restricted or in a more comprehensive sense. If it be palpable from the context of the will that it was his purpose to use it in its restricted sense, then, this being the intention of the testator, we should feel constrained so to declare, though partial intestacy should be the consequence. But unless it be apparent, and obviously so, from the language of the will itself, that he did use it in such restricted sense, we feel equally constrained to declare against this partial intestacy, unless some rigorous rule of law were interposed to prevent us. It is not consonant with reason to indulge a hypothesis, or a mere presumption, that a rational being, who sets himself to the solemn task of making a testamentary disposition of his worldly estate, intended still to die intestate as to a portion of it. Such an interpretation of the purpose of the testator, unless the language of the will unequivocally and imperatively required it, would be exceedingly irrational. But the language of this will makes no such exaction. If it does not, the doctrine is well fortified, as well by the attestation of highly accredited elementary writers as by the decisions of various distinguished jurists, with which it is needless to encumber this opinion, that the term money, in the residuary clause of a will, may be used to pass the whole personal estate of the testator. We think it has been so used in this will, in which opinion we are strengthened and confirmed by the request of the testator to the county court, in his codicil, not to exact security of his executors for his real estate devised in his will, but to require security of them for his personal effects, which comprised much the larger portion of his estate. We therefore think the testator had no intention to die intestate as to any portion of his property, but that the whole of his personal estate passed by his will to the designated objects of his bounty.

And this brings us to the investigation of the second proposition mooted and discussed by the learned counsel

xxxi—2

in the cause, who, we feel no fastidiousness in confessing, have evinced so much assiduity in legal research and exhibited so much ability in debate.

We frankly confess that this branch of the subject is not unattended with difficulties, which the counsel on both sides, throughout their briefs and their arguments, seem tacitly to have acknowledged in their very interesting investigation of the law of the case. We feel those difficulties in all their force. And we are inclined to think they are mainly superinduced by the complication of the English rules of the construction of wills, having their origin not exclusively in the common law, properly so called, but based in part upon a recognition of their statutes of distribution and their statutes of wills, as parts of the established laws of the land, with the common law adopted by us, to be construed in connection with our statutes of distribution and our statute of wills. Certain it is, if there be a rule of construction and interpretion of wills which, when applied to the language of the testator, would make its fair construction an estate tail, it would, in this country, totally defeat the devise, and cast it upon the statute of descent and distribution, to pass as that statute prescribes, because such a devise is repugnant to our system. Not so, however, in England. The devisee would still take the estate as a purchaser. Here, the heir would be let in to the inheritance. Hence, the rules established by British precedents and the law of wills, interpreted by British jurists, are no infallible guides for American jurists. To the extent of furnishing us aid, and of enlightening our minds as to what the unadulterated common law is, which can be made applicable to our system, we will always be enabled, from the uniform and distinguished intelligence of British jurists, to derive great facilities and advantages. We cannot admit the position, however, that English precedents are authoritative and binding upon the conscience or the judicial action of the courts of this country, even

where the common law has been adopted by express statute.

Recurring, then, in this branch of the investigation, to the governing and controlling object to be sought after in the interpretation of wills—the intention of the testator— if that intention is not clearly made manifest by the language of the will itself, it would be a sound canon of interpretation, in our judgment, to give it that construction which would put it most in harmony with our system of jurisprudence and with the statutes of distributions and of wills, which the testator himself would naturally enough expect to be done, if his language should prove so vague and indeterminate as to require construction. If he should fail to be explicit in the language of his will, he would naturally suppose that the vagueness would be elucidated in the light of the statute of descent and distribution and of the statute of wills. The policy of each of those statutes is, that where the persons to take stand in the relation of brothers and sisters and children and descendants, and part are living and part dead when they come into partition of the inheritance from each other, or take by devise from an ancestor, the children of the deceased objects only take the shares of their deceased parents. The law presumes, at least, that the testator is familiar with this provision, and any mode of expression in a will which seems to imply such a conception of the testator as taking by representation, being accordant with the general policy of the law, it may very properly be so appropriated in the true interpretation of the will of the testator. In this case, the brother being dead at the time of the speaking of the will, "the family of Andrew Paul, deceased," or the children of Andrew Paul, deceased, which, from the context of the will, are undoubtedly convertible terms, could certainly "take according to the statute, or in allusion thereto," as the representative of their father, the deceased brother of the testator. This case, therefore, is not

complete and perfect in its analogy to the case of Blackler
v. Webb, 2 Peere-Williams, of the original soundness of
which decision great distrust and doubt were felt and ex-
pressed by eminent English jurists.   Succeeding English
judges yielded to its authority, and some American jurists
have imitated their example.   But from the numerous
adjudications made in this country in opposition to it,
which have been arrayed in the briefs of counsel and ad-
verted to in the discussions, we are satisfied it has never
been established as an inflexible rule of construction in the
American courts.   The weight of American authority is
decidedly against the rule.

Untrammeled, therefore, by the rule of construction and
interpretation, and scrutinizing the will itself to ascertain
the intention of the testator as to the objects of his bounty,
we find in the residuary clause that he enumerates only
five distinct objects of that bounty: Hannah Wilson, Robert
Wilson, Matthew Wilson, James M. Paul, and "the family
of Andrew Paul, deceased;" objects all *in esse*, it is legiti-
mate to presume, at the making and publication of the will,
and the class or family of Andrew Paul, deceased, consist-
ing at that time, as appears from the body of the will, of
four girls and two boys.   But who was to compose that
"family" at the death of the testator, when the voice of
the will first became potential, was only to be determined
by extrinsic evidence.   The will could furnish no clue to
determine it.   It might, in the chapter of accidents, have
been reduced, at the death of the testator, to a solitary
member, and still the designated objects would be five
in number at the time when the will first speaks.   We can
discover nothing in the will to indicate that the testator
regarded the "family" in any other light than as a unit,
and that unit one of the special objects of his bounty, de-
signated in his will to take an "equal amount" with each
of the other special objects therein designated by him.
We think this is the only interpretation of the intention

of the testator which a fair and just analysis of the whole context of his will will warrant.   In this view of the case we are fortified and sustained by numerous American decisions, and especially by the case of Walker v. Griffin, 11 Wheaton, 375, decided by Chief Justice MARSHALL, whose profound knowledge of American jurisprudence is unquestioned, and whose mind was more clearly cognizant of the true principles of property alienations in this country, whether by deed or will, than any English jurists possibly could be.   And though neither is absolutely authoritative upon us in the determination of this cause, we the more readily yield to the logic and persuasion of the American decisions, because most in harmony with our own convictions of the proper methods of interpretation under our system of law and policy.

With our interpretation of this will, we do not think that parol testimony was necessary to identify either the subject disposed of or the objects intended to be benefited by the testator's bounty.   And certainly it would not be admissible to prove how much was intended to be given to one and how much to another legatee.   This would virtually render nugatory all wills.   To permit them to be contradicted, added to, or explained, by parol evidence, might totally frustrate and defeat the testator's intended disposition of his property.   There is not that character of ambiguity in this will which would authorize the introduction of parol evidence to explain it.   The evidence of Cook and Quarles, offered to prove the intention of the testator, was inadmissible, and was rightfully excluded.

We are therefore of opinion, upon the whole case, that the judgment of the court below in construing this will, and in the decree pronounced, was in all things right, and it is

AFFIRMED.