# Richmond.

## McCabe v. Cary's Executor, Etc.

### March 15, 1923.

1. WILLS—*Construction—Surrounding Facts and Circumstances.*—Where a will was very inartificially drawn and the intent of the testatrix did not clearly appear from the context, a proper construction of the will requires that it be read in connection with the surrounding facts and circumstances, the condition of the testatrix and in the light of the context of the will itself.

2. WILLS—*Presumption Against Intestacy—Partial Intestacy.*—The only reason any one can have for making a will is to change the devolution of his property from that prescribed by the statutes of descent and distributions. Hence there is a strong presumption that the testator intended to dispose of his entire estate, and courts are decidedly averse to adopting any construction of a will which leaves a testator intestate as to any portion of his estate, unless compelled to do so.

3. WILLS—*Construction—Atmosphere of the Testator—Extrinsic Evidence.*— If the words of a will are of doubtful meaning, and this doubt is not resolved by reading the will as a whole, it is always permissible for the expositor to place himself in the atmosphere of the testator at the time of making his will, so as to enable him to see things as the testator saw them. This is a legitimate use of extrinsic evidence, for it does not in any way vary, alter, or contradict the terms of the written will.

4. WILLS—*Construction—Money.*—In its widest and popular sense money is frequently employed as synonymous with property, estate; including, when the context so indicates, any kind of property, even land.

5. WILLS—*Construction—Money—Extraneous Facts.*—Although the sense in which money is used in a will may be gathered from the context, still, under the settled rules of construction, its meaning may be also shown by extraneous facts and circumstances.

6. WILLS—*Construction—Taking Away the Inheritance from the Heir—Express Words.*—It is true that in England and in some of the States nothing short of express words will take away the inheritance from the heir, but, if it is clear from the will as a whole, construed in the light of the surrounding facts and circumstances, that the testator so intends, and effect cannot otherwise be given to that in-

tent, there is no inherent reason why the testator may not "take away the inheritance from the heir," if he chooses, without the use of express words. It is simply a matter of intention, and when that is discovered effect will be given to it.

7. Wills—*Construction—Money Held to Include Land—Case at Bar.*—In the instant case testatrix gave her sister "all money in my name from my father's and mother's estate." Testatrix had no money directly derived, as money, from the estate of her father or mother. Testatrix's other sister and her brother had no need of her help and they asserted no interest in her estate. From the surrounding circumstances it was apparent that testatrix desired to make her sister comfortable and independent. The bulk of testatrix's estate was derived from her father's estate.

*Held:* That the word "money" was used by testatrix as "property" or "estate;" that, the gift to the sister was "a taking away of the inheritance from the heir" for good and satisfactory reasons, and should be upheld, and that an undivided interest of testatrix in real estate passed to her sister.

8. Wills—*Construction—Amount.*—A will contained the following clause: "The am't received from my mother's estate to go to my brother, for whom my mother intended it, or to his children."

*Held:* That testatrix used the word "am't" in the sense of value, in whatever form it might be, and that she intended that her brother should have the very property which she had received from her mother's estate which she still had in kind.

9. Appeal and Error—*Costs—Suit for Construction of a Will.*—On appeal from a decree construing a will, where the appellees did not resist the claim of the appellant, nor enter an appearance in the Supreme Court of Appeals, no decree for costs will be made against them upon reversal of the decree.

Appeal from a decree of the Chancery Court of the city of Richmond, in a suit to procure the construction of a will. From an adverse decree, the complainant appeals.

*Reversed.*

The opinion states the case.

*John P. Leary* and *Hudson Cary*, for the appellant.

*C. W. Throckmorton, S. S. P. Patteson, McGuire, Riely & Eggleston,* and *Leake & Burford,* for the appellees.

BURKS, J., delivered the opinion of the court.

The only question involved in this case is the proper construction of the following will of Mrs. Lizzie Cary Daniel:

"I leave to my sister Gillie the use of the income from all money in my name, from my father's & mother's estate as long as she lives, for her own comfort first & .that she may have the comfort & pleasure of ministering to those whom we have together tried to help. At her death, the principal to be divided as she thinks I would like, & as she thinks best.

"The money from my husband's Life Insurance, $1,000.Va. Ca. Chem. Co. & $1,500 originally $5,000–4,500 recovered by my father when Co. failed—2,000 lost in failure of U. B. & B. Co., leaving $2,500 only that to $4,500 of the $5,000 recovered by my father when the co. failed be returned to his family, of the $2,500, wh. Mrs. Cave thinks was the amount of his estate apart from his life ins. policy (which was made out for me) of which as he died without will, only $\frac{1}{3}$ was mine the other two-thirds hers by her father's gift. I wish $2,000 to be given her to do with as she chooses.

"The am't received from my mother's estate to go to my brother, for whom my mother intended it, or to his children.

"Lizzie Cary Daniel,

"Jany. 23d. 1914."

The testatrix was survived by a brother and two sisters; one of the latter being the main beneficiary under her will.

The provision of the second and third clauses of the will have been carried into effect, and the question pre-

sented for our consideration is whether the undivided
one-half interest of the testatrix in two houses and lots
in the city of Richmond passed to her sister Gillie under
the first clause of the will, or the testatrix died intestate
as to that property.

[1] A proper construction of decedent's will requires
that it be read in connection with the surrounding facts
and circumstances, the condition of the testatrix, and
in the light of the context of the will itself.

The decedent, Lizzie Cary Daniel, was a daughter of
the late Col. John B. Cary, and was left a widow in 1879
upon the death of her husband, the late W. T. Daniel.
After his death she returned to her father's home and
lived there as a member of his family until after the
death of both her parents.  This was necessitated by
the fact that the only property she received from her
husband's estate was a life insurance policy for $5,000
in a failing insurance company, which policy was com-
promised by her father, Col. Cary, for $4,500.  But of
this $4,500 a part ($2,000) was lost in an unfortunate
investment, so that only $2,500 of this life insurance re-
mained, and this was invested at the time of her death.

Col. John B. Cary died in 1898, and his wife, Co-
lumbia H. Cary, died in 1902.  But Col. Cary's estate
was not divided until after his wife's death, and until
his estate was divided Mrs. Daniel and her sister, Mrs.
McCabe, who was then unmarried, were supported by
advances to them by their brother, T. A. Cary.

Upon the death of their two parents, Mrs. Daniel and
Mrs. McCabe each received from their estates property
appraised at $17,496; and Mrs. Daniel had in addition
the above mentioned sum of $2,500 saved from the
wreckage of her husband's estate.

Possessed of these modest estates, these two sisters,
then well along in years, the one a widow and the other

a spinster, lived together from the time of their mother's death in 1902 until Mrs. McCabe (then Miss Cary) was married in 1915 to the late Capt. W. Gordon McCabe, who has since died and left her a widow.

Living thus alone, these two elderly sisters' joint incomes were put into a joint fund for their common support. Though their combined income was necessarily slender for women of their station in life, it was augmented by their brother, T. A. Cary, a man of large means, who made up all deficits, gave frequent presents, a trip abroad, etc., and they were thus enabled to help some poor relations and near friends.

In these circumstances, they agreed that "whichever died first should leave the other what she had," and prior to Mrs. Daniel's death Mrs. McCabe had made a will, giving all her property to Mrs. Daniel "for life, with a few minor bequests."

Mrs. Daniel died August 3, 1915, leaving the will hereinbefore set forth, dated January 23, 1914, and an estate appraised at $23,000. At the death of her father and mother, Mrs. Daniel had no estate except the amount received from the insurance on her husband's life. The estate of her father was not divided until after the death of her mother, when both estates were divided in kind at or about the same time. Upon this division, Mrs. Daniel and Mrs. McCabe each received in stocks and bonds $15,037.00 from their father's estate, and $2,559.00 from their mother's estate. There were some small cash distributions in order to equalize the partition, and there was a division of some dividends received during the course of administration. But neither of them received any substantial amounts of money from these sources. Afterwards, some of these stocks were sold for them by their brother, T. A. Cary, and the proceeds invested in two houses and lots in the city of

Richmond, which were conveyed to them jointly, and which constitute the source of the present litigation. T. A. Cary, who was a man of large means, died in 1920, five years after the death of his sister, Mrs. Daniel. At no time has any of the heirs of Mrs. Daniel laid claim to any interest in the houses and lots aforesaid, nor do they now, but they have at all times heretofore and do now concur in the claim of Mrs. McCabe that the said houses and lots passed to her under the will of Mrs. Daniel. Mrs. McCabe has received all of the rents and profits from said houses and lots ever since the death of her sister, Mrs. Daniel, with the full knowledge and acquiescence of the other heirs of Mrs. Daniel. Shortly before the death of T. A. Cary, Mrs. McCabe received an advantageous offer for said houses and lots, which he advised her to accept, without claiming any interest therein, and which she did accept, but counsel for the purchaser raised the question as to whether or not the interest of Mrs. Daniel passed to Mrs. McCabe under the will of Mrs. Daniel, and as the will of T. A. Cary contained a residuary clause, although the said houses and lots are in no way mentioned or referred to in his will, this suit became necessary to determine the rights of all persons interested, and to clear up the title to the property.

[2, 3] The only reason anyone can have for making a will is to change the devolution of his property from that prescribed by the statutes of descent and distributions. Hence there is a strong presumption that the testator intended to dispose of his entire estate, and courts are decidedly averse to adopting any construction of a will which leaves a testator intestate as to any portion of his estate, unless compelled to do so. *Coffman's Adm'r* v. *Coffman*, 131 Va. 456, 466, 109 S. E. 454. The judicial expositor, therefore, starts out with

this presumption.   Furthermore, if the words of a will are of doubtful meaning, and this doubt is not resolved by reading the will as a whole, it is always permissible for the expositor to place himself in the atmosphere of the testator at the time of making his will, so as to enable him to see things as the testator saw them.   This is a legitimate use of extrinsic evidence, for it does not in any way vary, alter or contradict the terms of the written will.   Professor Graves, in an address before the Virginia Bar Association in 1893, on the subject of the use of extrinsic evidence in respect to written instruments (14 Va. Law Reg. 913), in speaking of the use of the facts and circumstances surrounding the testator says:

"As to the facts and circumstances, the law is that they are always admissible in evidence in a case of disputed interpretation; and this is clearly right.   For the object of interpretation is to ascertain the meaning of the words as used by the testator; what the words represented in his mind; what he understood to be signified by them; and for this purpose it is indispensable that the expositor should know the situation of the testator; the state of his family and property; his relations to persons and things; his opinions and beliefs; his hopes and fears; his habits of thought and of language; in a word, that the interpreter should identify himself with the testator as to knowledge, feeling and speech, and thus, scanning the words of the will from the testator's point of view, decide as to their meaning as used by him.   In the language of Chief Justice Marshall (*Smith* v. *Bell,* 6 Peters, 74): 'In the construction of ambiguous expressions the situation of the parties may very properly be taken into view.   The ties which connect the testator with his legatees; the affection subsisting between them; the motives which may reasonably be supposed to op-

erate with him and to influence him in the disposition
of his property, are all entitled to consideration in ex-
pounding doubtful words, and in ascertaining the mean-
ing in which the testator used them.'. And this language
is quoted and approved in *Colton* v. *Colton*, 127 U. S.
300. And in *Hatcher* v. *Hatcher*, 80 Va. 169, it is said:
'In order to better comprehend the scheme which the
testator had in his mind for the disposition of his estate,
the judicial expositor is permitted to place himself, figu-
ratively speaking, in the very shoes of the person whose
will he is called on to construe; and, with the aid of such
extrinsic evidence as is admissible for the purpose, to
possess himself of the condition of the testator and his
family, and of such surrounding facts and circum-
stances as may be reasonably supposed to have influ-
enced him in the disposition of his property.' See also
*Miller* v. *Porterfield*, 86 Va. 876, 11 S. E. 486."

The will of Mrs. Daniel contains three clauses, each
making a separate bequest. The third clause is a limi-
tation on the bequest contained in the first clause, but
the bequests contained in the second and third clauses
have been fully paid and satisfied, and we are now asked
to construe the first clause and determine whether or
not the bequest therein made embraces the undivided
one-half interest of Mrs. Daniel in the two houses and
lots aforesaid. It is not claimed by anyone that the
choses in action of Mrs. Daniel, if any she had, outside
of the money in bank, did not pass under her will, but
our enquiry is limited to the houses and lots aforesaid.
It will be observed that, as clause three of the will took
away from Mrs. McCabe "the am't received from my
mother's estate," there was nothing for clause one to
operate upon except "all money in my name from my
father's" estate.

It appears from the extrinsic evidence that at the

time the testatrix made her will in 1914, her next of kin who would have been her heirs at law were a brother, T. A. Cary, a sister, Mrs. White, who was a widow with grown children, and Mrs. McCabe, an unmarried sister advanced in years. The record does not disclose the pecuniary worth of Mrs. White, but, outside of the amount which she received from the estates of her father and mother, it appears that she had a grown son who was able to assist her if she needed pecuniary aid. T. A. Cary, her brother, was a man of considerable wealth, while the remaining sister, Mrs. McCabe, was then unmarried, and her estate was inadequate for her support in the society in which she moved. We find then a purpose on the part of the testatrix to exclude her brother and Mrs. White from participating in her estate, and the reason for it was because they did not need her assistance, and a further purpose to give her estate to her sister, Mrs. McCabe, because she needed it for her comfortable support and that "she may have the comfort and pleasure of ministering to those whom we have together tried to help." In order to accomplish this purpose it was necessary for the testatrix to give to Mrs. McCabe her undivided half interest in said houses and lots, for it appears from the testimony of her administrator that if the houses and lots do not pass under the will, the testatrix died intestate as to about nine-tenths of her estate, and there would not be left enough to accomplish the end the testatrix had in view.

The will is very inartificially drawn. It has neither the opening clause nor closing paragraph common to wills. It is not designated as a will. It appoints no executor. It does not specifically designate the beneficiaries and gives no description of the property bequeathed. We have to resort to extrinsic evidence to ascertain who it is that is referred to as "my sister Gil-

lie," and as "my brother," and that she had only one brother; and the second clause can hardly be construed at all without the aid of extrinsic evidence. It appears from the testimony that the testatrix had no property of any description except what she received from either her father's estate, her mother's estate, or her husband's life insurance. What she received from her mother's estate was "eighteen shares of Virginia Chemical Preferred Stock and six shares of the Richmond Building Loan and Trust Company," which remained in kind at the time of her death, and was delivered in kind by her administrator to the beneficiary. She received no money from her mother's estate, nor any substantial sum from her father's estate—only some small sum to equalize the partition, and her share of dividends accumulated during administration. At the time she made her will, her father's and mother's estates had been distributed some ten or twelve years, and the small sums received in cash had long ago been used, as her entire income was not sufficient for her support, and was supplemented from time to time by gifts from her wealthy brother, so that when the will was made, and at the time of her death, there was no money in her name from her father's estate, except what, if anything, remained of the income received by her from that portion of her estate.

We have no cases in this jurisdiction that are very helpful in the solution of the question now before us, but we give such decisions as have been made simply to show to what extent we have gone on related subjects. *Dabney* v. *Cottrell's Adm'r*, 9 Gratt, (50 Va.) 572, holds that choses in action do not pass under a gift of "money" in a will unless the context requires that construction, but at the same time concedes that "the intention of the testator must be gathered from the terms of the will, and by such light as the surrounding circumstances

throw upon the case; and little aid is to be derived from the construction of other wills."

In *Dillard* v. *Dillard*, 97 Va. 434, 34 S. E. 60, the bequest was "all the money" given to certain trustees and remaining unexpended. The question was what was covered by the phrase "all the money," and it was held, under the facts of that case, that the phrase embraced a judgment which had been recovered on a bond given to the husband as trustee for his wife, the testatrix. It was said by Rieley, J., speaking for the court: "It seems to be well settled that a gift in a will of 'money' with nothing in the context to explain or define the sense in which it is used, included cash, bank notes, and money in bank, but does not include choses in action or certificates. The word, however, is often popularly used as synonymous with personal estate, but has been construed to include besides money literally so called, not only debts and securities, but the whole personal estate, and even the proceeds of realty. 1 Jarman on Wills, 724–32; *Dabney* v. *Cottrell's Adm'r*, 9 Gratt. (50 Va.) 572, and *In re Miller*, 17 Am. Rep. 422. What is meant by the word 'money' must, in each case, depend upon the will and its context."

In *Prison Association* v. *Russell's Adm'r*, 103 Va. 563, 568, 49 S. E. 966, 968, in discussing residuary clauses in wills, the following quotation is made from Schouler on Wills (3rd. ed.), sec. 522: "Such words as 'rest,' 'residue,' 'remainder,' are not indispensable to a residuary bequest of personal estate; but in various instances words and expressions quite informal have been given this effect, out of regard to the testator's obvious intention. A devise of this character has been held, agreeably to the intent of the will, to carry all the real estate, although 'money' was the term employed."

In *Coffman's Adm'r*, v. *Coffman*, 131 Va. 456, 109 S.

E. 454, it was held that the word "effects" was broad enough to cover real estate as well as personal estate, if the will when read as a whole, and in the light of the surrounding facts and circumstances, manifested such an intent.

Of course, we have many cases holding that when the intention of the testator can be discovered in the manner required by law, it will be given effect, provided it is not contrary to law.

While our own decisions throw but little light on the subject under consideration, the decisions elsewhere are very helpful in arriving at a correct conclusion.

In *Mount Holly Safe Deposit & Trust Co.* v. *Deacon,* 79 N. J. Eq. 120, 122, 81 Atl. 356, 357, it is said:

"A great number and variety of adjudicated cases are reported in which the courts have been called upon to define the meaning of the term 'monies' as used in wills. An extended review of these cases seems unnecessary. It will be found that the word may be appropriately used to mean cash only, it may also be used as the equivalent of personal estate, and may also be used as the equivalent to property and thus include real and personal property. In the ascertainment of the intention of the testator in the use of a word of this degree of flexibility in its popular meaning the context of the will is of peculiar force. If it clearly appears from the context that the testator used the word in either of the meanings above suggested, that meaning must be adopted."

[4] Courts frequently give an enlarged meaning to the word "money" in order to avoid intestacy. *Torrance's Estate,* 15 Misc. Rep. 317, 37 N. Y. Supp. 584; *Lamb* v. *Lamb,* 131 N. Y. 227, 30 N. E. 133; *Paul* v. *Ball,* 31 Tex. 10.

Many of the cases pro and con will be found cited in

the notes to 20 Am. & Eng. Ency. Law (2nd ed.), 842. In 27 Cyc. 820, it is said: "In its widest and popular sense it is frequently employed as synonymous with property; estate; including, when the context so indicates, any kind of property, even land. Sometimes it includes the whole personal estate, and often the proceeds of realty. The meaning of the word, when used in a will, depends upon the context, and may be affected by the condition of the testator's property and the surrounding circumstances; but a construction broad enough to give it a meaning which includes real estate can only be sustained where the intention is so clear and plain as to be in effect compulsory." For the last proposition the author cites *Sweet* v. *Burnett,* 136 N. Y. 204, 32 N. E. 628, and adds: "The word 'monies' as used in wills containing bequests of monies 'has but seldom been held to apply to real estate.' *Widener* v. *Beggs,* 118 Pa. 374, 379, 12 Atl. 311. But the word will be construed to include both personal and real property, if it appears from the context and on the face of the instrument that such was the intention of the testator. *In re Miller,* 48 Cal. 165, 171, 22 Am. Rep. 422."

In the *Mount Holly Case* the testatrix, by the fifth clause of her will, gave to her sister "all the rest, residue and remainder of my estate and effects, real and personal of what kind and nature so ever." By the sixth and seventh clauses of her will she provides that, if her sister should survive her "the monies belonging to my estate" shall go to two other designated legatees. The testator survived her sister. It was held that the real estate as well as the personalty passed to the legatees mentioned in clauses six and seven. In the *Miller Case* cited in the notes to Cyc. above, the gift was to the testator's mother of "the balance of my money" but the court gathered from the introductory clause of the will

that the testator intended the gift to cover the balance of the whole of the estate, real and personal.  In the course of the opinion it is said:

"The controversy hinges upon the construction to be placed upon the word 'money' in the seventh clause; and the question is whether that word, in the connection in which it is used, is to be interpreted as including the real estate of the testator.  It is conceded by the appellant that the word 'money' in wills has been frequently construed by the courts, both in England and America, to include the personal estate of the testator. The following authorities would seem to place this point beyond all doubt (citing cases).  But the appellant, whilst conceding the rule in respect to personal estate, contends that a devise of 'money' cannot be held to include the real estate.  We are unable, however, to perceive why, under our probate system and laws of descent and distribution, there should be any distinction in this respect, between the real and personal estate; and have been referred to no authority, which, in terms, makes any such distinction.  It may be that in England, where it is the policy of the government to perpetuate real estate in families, rather than to disseminate it in small parcels among the masses; and, possibly, in some of the American States, where the real estate passes immediately to the heir, and is not assets in the hands of the administrator for the payment of debts, a more stringent rule of interpretation might be favored, whereby a devise of 'money' would be held not to include the real estate, under any circumstances.  But in this State, both the real and personal estate are assets in the hands of the administrator for the payment of debts, with only this distinction between them, viz.: That the personalty must be first exhausted before the realty can be so applied, and our policy, unlike that of

England, is to disseminate real estate, rather than to perpetuate it in families. Hence, we should adopt the more liberal interpretation, whereby, in construing a devise of this character, the real and personal estate would be placed on the same footing. Nor can we see why, on principle, there should be any difference between them. A devise of 'money' is held to include the personal estate only when it appears on the face of the will, construed in the light of the surrounding facts that such was the intention of the testator; and we can see no reason why the same rule ought not to be applied to the real estate."

[5] It is true that in the *Mount Holly Case, supra,* and also in the *Miller Case,* 48 Cal. 165, 22 Am. Rep. 422, the meaning of the word "money" was gathered from the context, but, under the settled rules of construction to which we have adverted, it may also be shown by extraneous facts and circumstances.

In *Estate of Jacobs,* 140 Pa. St. 268, 21 Atl. 318, 11 L. R. A. 767, 23 Am. St. Rep. 230, at the time of making her will, the testatrix owned no real estate, but afterwards bought it, and at the time of her death her real estate was nearly equal to the personal estate. She gave certain pecuniary legacies, and then "the remainder and residue of my money" she gave to a hospital. If the real estate did not pass under her will then the legacies which she had given would have been cut down fifty per cent. The heirs of the testator were excluded by the will, and the court recognized the doctrine that an heir at law can only be disinherited by express devise or necessary implication, and that the implication must be such a strong probability that an intention to the contrary cannot be supposed, and yet held that the real estate passed under the above designation. In the course of the opinion it was said:

"What, then, did the testatrix intend by the residuary bequest of the 'remainder and residue of my money?' The word 'money,' literally, means cash; and, if we adopt this interpretation, nothing passed by this clause. It was conceded, however, that this word was the equivalent of property. It was contended by the appellant that it included only moneyed securities and perhaps other personal estate. That the word 'money' is popularly known and used as indicating property of every description is well known. Thus, it is very common to refer to a person as a 'moneyed man' because of his large possessions. Yet those possessions may consist exclusively of real estate. It appears very plain to us that this testatrix used the word 'money' in its popular sense as the equivalent of property, and that she intended all her estate to pass by the residuary clause. She knew of what her estate consisted when she made her will. She knew it would satisfy all the pecuniary legacies, and leave a small residue; and if we construe the will as of the time of her death it is most unlikely she intended the legacies she had given to those who were evidently the first objects of her bounty, should be cut down by one-half in favor of her heirs at law whom she never intended to derive any benefit from her estate."

In *Levy's Estate*, 161 Pa. 196, 28 Atl. 1070, the great bulk of the estate of the testatrix had in it no money at all, and while the context of the will precluded "the possibility of attributing to her any other intent than to make a gift of money distinctly as such," it was said: "While it is perfectly true that the word money may, when so intended by the testator, include any kind of property, even land, it can never have that effect when the text of the testament clearly shows it was not so intended."

*Sweet* v. *Burnett*, 136 N. Y. 204, 32 N. E. 628, hereinbefore referred to, presents a strong argument against ever giving to the word "money" a meaning broad enough to cover land. It is there said:

"It may be true that the word 'money' might be so used in a will as to include and cover a farm or some specific real estate. One authority to that purport has been brought to our attention (*Estate of Miller*, 48 Cal. 165), but certainly no such violent extension of the word beyond its normal and proper meaning can ever be justified unless the intention to so use it is clearly manifest on the face of the will and put beyond all reasonable doubt." Again at page 210: "While it is true that the meaning of the word 'money' when used in a will depends upon the context, and may be affected by the condition of the testator's property and the surrounding circumstances (*Smith* v. *Burch*, 92 N. Y. 228), it must yet be added that a construction broad enough to give it a meaning which includes real estate, if ever possible, can only be sustained where the intention is so clear and plain as to be in effect compulsory."

In *Glendenning* v. *Glendenning*, 9 Beavan, 324, 50 Eng. Reprint, 368, the testator's estate consisted chiefly of money in funds. The remainder of his property consisted of about fifty pounds cash, and a few chattels. The testator bequeathed to his wife "the interest of my money, and the use of my goods for her life," with remainders over. It was held that the wife took an estate for her life in the whole personal estate of her husband. The master of the rolls said:

"In construing wills, the court endeavors to give such construction to the words as will make the whole context consistent with the apparent general intention of the testator.

"In this case, it appears that this testator intended to dispose of the whole of his property by his will.

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*

"Consistently with the ordinary mode of expression, an extended meaning may be given to the word 'money.' We hear persons daily talking of their *money in the funds*, meaning thereby perpetual government annuities; and the term money has acquired a popular meaning in many other like cases. I agree, that if you take the word 'money' by itself, it means money in its strict sense, and nothing else; but when used in connection with other words, it may have a much more extended signification. There is nothing new in that construction of the word, for in the old Roman law, the word 'pecunia' was held to pass property of every description."

In *Pritchard* v. *Pritchard*, 11 L. R. Eq. 232 (1870), the testator owned two freehold houses, a freehold rent charge, two hundred and thirty nine pounds in bank, and personal property, consisting mostly of his interest in several partnerships, amounting to over forty thousand pounds. By his will he gave to his wife "while unmarried, for the support of herself and the education of my children," the income arising from his "principal money." No extrinsic evidence was introduced, and the court was called upon simply to construe the language used. The testator left a wife and six children. It was held that the testator intended to provide an income capable of supporting his wife and educating his children, which could not be done out of the property falling within the strict meaning of money. Hence the term "principal money" embraced the whole of the personal estate, including leaseholds, but not the freehold property. With reference to the latter, it was said: "The words cannot be extended to the real estate, because there is at all times great favor shown by the court to the heirs at law, and nothing but express words will take away the inheritance from the heir."

*In re Cadogan* and *Cadogan* v. *Palogi*, 25 L. E. Eq. 154 (1882), is thus stated in the syllabus: "A testatrix who is possessed of cash securities, leaseholds, furniture and effects by her will made in expectation of her death which occurred two days after its date, gave 'one-half of the money of which I am possessed to H. and the remainder equally between O. and S., and after them to their children.' *Held*, that the word 'money' passed all the personal estate." In the course of the opinion by Kay, J., it is said:

"If I adopt the narrower construction nothing would pass but the 270 pounds in the bank at the date of the death. This was so soon after the date of the will that probably the testatrix had little if any more when her will was made. Can it be that she intended to leave only such cash as she had at her bankers, being but a small part of her property, among her three sisters, and that she intended to give two of them life interests in their shares with remainder to their children, and to die intestate as to the rest of her personalty? I cannot bring myself to a conclusion which seems to me so absurdly impossible. I am not only at liberty but I am bound to give a liberal interpretation to the words to avoid an intestacy, and for these reasons I feel compelled to hold that the lady used the word 'money' in this will in the popular sense as a description of all her personal estate, and I do not think that any of the cases have laid down a rule which prevents that construction.

"I do not forget that part of the personal estate consists of leaseholds and furniture, property which is not aptly described by the word 'money.' But I am of opinion that I cannot exclude these, because the choice seems to me to be between construing 'money' to mean 'cash at the bank' or 'personal estate,' and on the whole I think the latter the true construction.

"One of the cases I have mentioned, *Prichard* v. *Prichard*, is, I think, an authority for this, so far as a decision upon one will can help in construing another. Leaseholds and furniture and all the personal estate it was there held passed by similar words. That case is at least an expression of opinion, in which I respectfully concur, that there should be no absolute technical meaning given to such a word as 'money' in a will, but that its meaning in every case must depend upon the context, if there is any, which can explain it, and upon those surrounding circumstances, which the court is bound to take into consideration in determining the construction."

[6] It is true that in England and in some of the States nothing short of express words will take away the inheritance from the heir, but if it is clear from the will as a whole, construed in the light of the surrounding facts and circumstances, that the testator so intends and effect cannot otherwise be given to that intent, there is no inherent reason why the testator may not "take away the inheritance from the heir," if he chooses, without the use of express words. It is simply a matter of intention, and when that is discovered effect will be given to it. As said in the *Miller Case*, hereinbefore quoted, "A devise of 'money' is held to include the personal estate only when it appears on the face of the will, construed in the light of the surrounding facts, that such was the intention of the testator; and we can see no reason why the same rule ought not to be applied to real estate."

[7, 8] In the case in judgment, the testatrix apparently had in mind all of the time while drafting her will her property as she had received it from the estates of her father and mother, and in the condition in which it was received. It came to her in the form covered by the

generic term of money.  Her brother was managing it
for her, and in her eyes it was money.  She simply ig-
nored the change in the form of the investment of a
part of her money.  She knew that she had received so
much "money" from her father's estate, and so much
"money" from her mother's estate, and this, which she
termed "money," she undertook to dispose of by her
will.  If "money" be construed in its restrictive sense,
she had nothing of the money which she received on the
distribution of the estates of her father and mother, and
the first and third clauses of her will were wholly in-
operative, and if it be extended to include choses in
action only, it would still leave her intestate as to a
large portion of her estate.  It does not appear from the
record that the testatrix had any "money" in her name
at the time the will was executed, derived directly, as
money, from the estate of her father or mother, though
she still owned the property acquired from her father's
and mother's estates, and yet in disposing of her prop-
erty she uses the word "money" or its equivalent in
every paragraph of her will.  In the first paragraph, it
is "all money in my name from my father's and mother's
estate," although she had none received directly in that
form.  In the second paragraph, "the money from my
husband's life insurance," all of which had been in-
vested; and in the third paragraph, "the am't received
from my mother's estate," although it was received in
stocks which remained in kind until her death.  One of
the primary meanings of *amount* is, "the sum of prin-
cipal and interest."  (Standard Dict.)  It seems plain
that the testatrix used the word "am't" in the sense of
value, in whatever form it might be, and that she in-
tended that her brother should have the very property
which she had received from her mother's estate which
she still had in kind.  So likewise she intended that her

"sister Gillie" should receive that portion of her estate which she had received from her father's estate, which she designates as "all money in my name from my father's * * estate." The word "money" is there used as "property" or "estate." Reading the will in the light of the facts and circumstances surrounding the testatrix, it appears to have been the intention of the testatrix to leave to her maiden sister, who was without adequate means of support in her station in life, her property which she had received from her father's estate, so as to render her independent in her support, and also to enable her to minister "to those whom we have together tried to help." What she received from her father's estate constituted the bulk of her estate, and this she desired to be applied to the "comfort and pleasure" of her "sister Gillie" with whom she had been thrown so long in intimate association and affection. They had together had the pleasure of helping some poor relations and friends, and she desired her sister to continue to enjoy this privilege, as well as be made comfortable and independent. This appears to have been her chief object in making a will. Her other sister and her brother needed no such help, and the gift to the appellant, under the circumstances, was "a taking away of the inheritance from the heir" for good and satisfactory reasons to the testatrix, and should be upheld. We think that the extrinsic evidence warrants this conclusion. Any other construction would render the testatrix intestate as to more than half of her estate, and this is to be avoided, unless we are forced to a different conclusion, as we think we are not in the case in judgment. None of her heirs is complaining or asserting any interest in her estate, and in view of the facts and circumstances surrounding the testatrix when she executed her will, and at the time of her death, we are of opinion that

29

the construction we have placed upon her will accords with the meaning of the words as used by her, and with the benevolent rule of interpretation, *ut res magis valeat quam pereat.*

[9] For the reasons stated, the decree of the Chancery Court of the city of Richmond will be reversed; and, as the case is fully before us on the record, this court will enter such decree as the said chancery court ought to have entered, declaring that the undivided one-half interest of Lizzie Cary Daniel in the two houses and lots in the bill and proceeding mentioned passed under her will, bearing date January 23, 1914, to the appellant; and as the appellees have not resisted the claim of the appellant, nor entered an appearance in this court, no decree for costs will be made against them.

*Reversed.*