# 𝔚𝔶𝔱𝔥𝔢𝔟𝔦𝔩𝔩𝔢

## MILDRED ELIZABETH WALTON, ET ALS. v. ROBERT D. MELTON, ETC.

June 6, 1945.

Record No. 2910.

Present, All the Justices.

The opinion states the case.

*George D. Bowles,* for the appellants.

*H. Carter Redd,* for the appellee.

BROWNING, J., delivered the opinion of the court.

This will is before us for construction.

"I, Emma Catherine Wright of ·Hanover County, Virginia, do hereby make and constitute this my last will and testament.

"*First* I do desire that all my just debts be paid.

"*Second* I do give and bequeath all the tangible personal

property in my dwelling house to those of my following nieces that may survive me, namely, Mildred Elizabeth Walton, Amanda E. Harris, Margaret Walton, Viola Agnes Mills.

"*Third* I do give and devise my tract of land on which I now reside and all my other property to Robert D. Melton and in case the said Robert D. Melton shall make any improvements to the houses on said land or shall erect any other buildings on said land, they shall pass to him at my death.

"*Fourth* I do nominate and appoint the said Robert D. Melton as the executor hereof and I do request that he be allowed to qualify as such without giving any security.

"Witness my hand and seal this .... day of October in the year 1937.

Emma Catherine Wright, (Seal)."

Emma Catherine Wright, a resident of the County of Hanover, Virginia, died January 27, 1944, leaving the above quoted will. Certain circumstances and conditions of her life reveal a setting which is unique and novel in the extreme. She was approximately seventy-five years old. She owned a tract of some 14 acres of land and lived alone in a small house located on it for a great part of her life. She was thought by her neighbors and friends to have been a very poor person—in dire and necessitous circumstances. Persons in the neighborhood contributed to her comfort and needs. Members of the church to which she belonged, and indeed, the church itself, as a unit or body, extended to her aid of a material nature. Mr. Robert D. Melton and his wife were chief among those who rendered her assistance. They looked after her and supplied her wants in a liberal and generous way. Mr. Melton did not live on Mrs. Wright's farm but he went by to see her every day at times and several times a week at other periods. Mr. Wright, the husband of the testatrix, died in 1930, and after his death Mr. Melton worked the farm for her on a share crop basis. He testified that her part of the crops was harvested and sold and she received her part of the selling price. Mr. and

Mrs. Melton provided her with many of the necessities of life. He would supply her with firewood and put it in place for her use and his wife would visit and nurse her when she was sick and also washed and cooked for her at times. These relations, however, were in a degree, reciprocal. Mrs. Wright gave Mr. Melton the watch and chain which belonged to her husband. The peculiar feature of her life which has been referred to, is, that upon an examination of the house and her effects, there was found money to the extent of more than $6,000. Several hundred dollars of this was in gold and silver coin and the rest was in bank notes ranging in denominations from one to fifty dollars. This money was concealed in various places, as buckets, bags and kegs. A bank-book was found which showed that she had a savings account containing a balance of $700 in one of the banks of the county. There were some furniture and household effects in the house of an appraised value of $326 and some garden tools and implements in a smoke house valued at $8. The real estate, consisting of the dwelling and farm, was valued at $1,800.

The four beneficiaries, under the second clause of the will, nieces of the testatrix, instituted suit praying for the construction of the will. Robert D. Melton, beneficiary under the third clause and the executor, was made a party defendant and it was asked that the heirs at law of the testatrix be determined in the event it was necessary.

The plaintiffs below, the appellants here, took the position that, under the second clause of the will, all the personal property in the dwelling house, including the money already referred to passed to them.

Mr. Melton, the appellee, contended that, by the terms of the third clause, the money went to him, under the theory that money is intangible personal property, and that the general residuary words "all my other property", included it. He fortified his position by urging that the bequests to the beneficiaries under the second clause were restricted by the

word "tangible" and that only that species of property, as defined by him, passed thereunder.

The trial court adopted the theory of the appellee and so decreed, the learned Chancellor filing an able opinion, explanatory of his views, which is a part of the record. Portions of the testimony, deemed to be important, are in the record and are the basis of the statements of fact already made. We may add, that certain of the appellants kept in touch with the testatrix, who was their aunt, by visiting her at times, and one of them, Viola Agnes Mills, lived with her for a period of six months, while attending school.

The cardinal rule to be employed in the construction of wills has many times been aptly stated by this court.

In *Coffman* v. *Coffman*, 131 Va. 456, 463, 109 S. E. 454, quoting from *Penick* v. *Walker*, 125 Va. 274, 278, 99 S. E. 559, it was said:

"The primary consideration and rule of construction is to determine the intention of the testator from the language which he has used. If the meaning of that language is plain, the will must be given effect accordingly. This rule is familiar and elementary, and to it all others are subordinate and subservient."

In *James* v. *Peoples Nat. Bank*, 178 Va. 398, 404, 17 S. E. (2d) 387, this statement appears:

" * * * While rules of construction are well established, the dominating rule is the intention of the testator. This intention, gathered from the whole will, must predominate over all technical words and expressions. When ascertained, the intention, as expressed in the various wills, explains and limits to their proper application the various exceptions and refinements of distinction to be found in the cases."

In *Horne* v. *Horne*, 181 Va. 685, 691, 26 S. E. (2d) 80, is this:

"Technical rules of construction are not to be invoked to defeat the intention of the maker of the instrument, when

his or her intention clearly appears by giving to the words used their natural and ordinary import."

Our inquiry then is what was the intention of the testatrix at the time she made her will and in reaching this we must place ourselves as nearly as may be in her situation. After the payment of debts she had first in mind four of her nieces, whom she mentions by name, as objects of her testamentary favor. What does she give them? "All the tangible personal property in my dwelling house."

All the property in her dwelling house was $314, or $326 worth of household furnishings and $6,801.96 in money, which latter was of the kinds and in the receptacles referred to. The money had been there for years as evidenced by its type and appearance. The fact that she had it was kept a profound secret. She was the only human being in all the world who knew of its existence and she alone knew where it was. This place she described with accuracy as "my dwelling house". She did not give or bequeath to her nieces a part of the tangible property in her dwelling house but she gave them "all" of it. Being a person of limited educational attainments, it is doubtful if she knew the meaning of the word "tangible".

It will be borne in mind that the appellants were her nieces—her own "kith and kin"—a relationship nearly as close as that of one's children. "Blood is thicker than water".

Mr. Melton was not a kinsman of the testatrix. He was only a cousin of her deceased husband. It is true that one could not have been more attentive or kinder to her than he, but being the recipient of her bounty, to the extent he is conceded to be, he is far from being unrecompensed. He gets the farm, with the houses, and all the property which was not in the dwelling house. Under the general residuary words of the third clause, "and all my other property", the bank balance of $700.00 passes to him.

Were his contention to prevail Mrs. Wright's four nieces, who were first in her thought would have the trifling sum of $326.00 worth of household goods divided among them.

■■ It is manifest that this was not her intention when the will in its entirety is considered. The disposing terms in the two clauses differ. In the second clause is the phrase "give and bequeath." These are words of a testamentary nature usually applied to personal property, while in the third clause are the words "give and devise" which generally apply to real estate.

It is significant that in the third clause, after the words "all my other property", the testatrix seems concerned only with real estate. The will particularizes, saying, "in case the said Robert D. Melton shall make any improvements to the houses on said land or shall erect any other buildings on said land, they shall pass to him at my death."

The thing which was uppermost with her, in connection with Mr. Melton, was "said land" and any accretions to it through his instrumentality. The subjective theme of said clause is *land*, the related objective theme is *Robert D. Melton*. The details are explanatory of its purpose and the general expression "all my other property" is qualified by the succeeding terms.

■ We are thus brought to the inescapable conclusion that from the whole will there is clearly seen the intention of the testatrix to leave all of the property in her dwelling, including the money, to her four named nieces.

It is apparent that we think the decree of the learned chancellor is erroneous.

We reverse the decree except as to its disposition of the bank balance, which we affirm, and remand the case to the trial court to be further proceeded with but not in conflict with this opinion.

*Reversed in part, affirmed in part and remanded.*

HOLT, J., dissenting.

Having held in *Roanoke* v. *Michael's Bakery Corp.*, 180 Va. 132, 21 S. E. (2d) 788, that a motor-driven freight truck

is intangible personal property, we now hold that a paper dollar is tangible personal property. Both cannot be right.

The value of paper money is not measured by the paper on which it is printed and bears no relation to it. The Government might stamp on one bit of paper a promise to pay "One Dollar" and on another, in every respect the same, a promise to pay "Ten Dollars."

I chance at the moment to have in hand a note on which the Federal Government has written this promise: "Will pay to the bearer on demand ten dollars." On another this appears: "One Dollar in silver payable to the bearer on demand." Both of these notes have this in common: There is a promise on the part of the Government to pay. And in this they in no wise differ from Government bonds. One is the promise to pay on demand and the other to pay at some stated time. Both are printed on identical paper. The paper, of course, is in each instance tangible, but concededly such a bond is an intangible asset, just as is any other promise to pay whether it be written or unwritten.

"There is an obvious distinction between tangible and intangible property, in the fact that the latter is held secretly; that there is no method by which its existence or ownership can be ascertained in the state of its situs except, perhaps, in the case of mortgages or shares of stock. * * * In this class of cases the tendency of modern authorities is to apply the maxim *mobilia sequuntur personam*, and to hold that the property may be taxed at the domicil of the owner as the real situs of the debt. * * * Such have been the repeated rulings of this court." *Rounds, etc., Lbr. Co.* v. *Livesay*, 66 F. (2d) 298. See also, *Welch* v. *Boston*, 221 Mass. 155, 109 N. E. 174, Ann. Cas. 1917D, 946.

The State may classify properties and tax them accordingly. *Buck* v. *Beach*, 206 U. S. 392, 27 S. Ct. 712, 51 L. Ed. 1106. See also, *Blodgett* v. *Silberman*, 277 U. S. 1, 48 S. Ct. 410, 72 L. Ed. 749; *First Nat. Bank* v. *Maine*, 284 U. S. 312, 52 S. Ct. 174, 76 L. Ed. 313, 77 A. L. R. 1401.

Since paper money has no intrinsic value, and since its

value consists of our faith in the Federal Government and its promise to pay, it is on principle intangible property, wherein it differs from tangible personalty, intrinsically valuable—like diamonds, etc. It is merely a medium of convenience through which wealth and labor are measured. *In re Missouri Pac. R. Co.*, 7 F. Supp. 1.

When we come to consider the case in judgment and the will out of which the case arises, there are in Virginia two fundamental rules:

" * * * Generally, ordinary words are to be given their usual and ordinary meanings, and technical words, are presumed to have been used in a technical sense. *Conrad* v. *Conrad*, 123 Va. 711, 97 S. E. 336, 338."

Technical words carry with them their technical definitions unless the contrary plainly appears. *King* v. *Johnson*, 117 Va. 49, 83 S. E. 1070.

When technical words in the line of his profession are used by an able and accurate lawyer, the presumption that they are accurately used is irresistible. One might as well undertake to discuss what an engineer who had built a bridge meant when he described it as a cantilever bridge.

This will was drafted by Judge Grinnan. He was a neighbor of the testatrix and presumably her friend, because she sent for him. He was one of the ablest and most accurate lawyers in Virginia.

Moreover, the drafting of wills was with him a specialty. He knew the classifications of property in Virginia, and when he wrote, "I do give and bequeath all the tangible personal property in my dwelling house to these of my following nieces," the gift of "tangible personal property" in itself carries with it the suggestion that there was in the home other personalty not tangible. Had it been Mrs. Wright's purpose to give to her nieces all of the property in her dwelling house, she would have said so. The gift of "tangible personal property" would not have been used had she not made her purpose plain to the draftsman. He would

not carelessly and of his own motion have used the technical word "tangible."

If it be said that in giving to these nieces property in the dwelling house carried with it the intention to give them everything there, then that reasoning would apply to all hidden assets, even though among them were bonds and notes. They everywhere come under the definition of "intangible property." *Welch* v. *Boston*, 221 Mass. 155, 109 N. E. 174, Ann. Cas. 1917D, 946.

These nieces were among her beneficiaries, and these are the claims which they had upon her bounty, the second clause of her will reading:

"I do give and bequeath all the tangible personal property in my dwelling house to those of my following nieces that may survive me, namely, Mildred Elizabeth Walton, Amanda E. Harris, Margaret Walton, Viola Agnes Mills."

Two of these nieces lived at Glen Allen, a few miles from the aunt's home, and two of them lived in Richmond. Viola Mills lived with her aunt for six months to go to school in Ashland but left before the school term was over. She was asked: "Just got tired of staying?" A. "Yes." While there, she said: "My mother sent most of the stuff I ate." She was not with her aunt during her last illness and had not seen her for five years before her death and contributed nothing to her support. Mildred Walton had not seen her aunt for five years, and Amanda Harris did not visit her as often as once a year.

Mr. Melton was her tenant, neighbor and friend. He "looked after Mrs. Wright, providing her with food, such as flour, meal, bacon, sugar, coffee, lard and other groceries and provisions, cutting and delivering to her firewood, packed and in place for immediate use, provided her with medical care and medicines, though some of the doctors' visits were paid for by Mrs. Wright herself, that Mr. Melton and his wife nursed Mrs. Wright in sickness and Mrs. Melton did the washing and cooking at such times and that they saw that everything necessary for her care and comfort was

provided. Neither Mr. Robert D. Melton nor his wife lived with Mrs. Wright, but Mr. Melton sent the above things if and when he could not stop by to see her."

The gift to Melton is so unambiguous that it is impossible for anybody to misunderstand it: "I do give and devise my tract of land on which I now reside and all my other property to Robert D. Melton.

The relation in which beneficiaries stand to the testatrix is to be remembered.

Chief Justice Marshall in *Smith* v. *Bell*, 6 Pet. (31 U. S.) 68, 74, 8 L. Ed. 322, said:

"In the construction of ambiguous expressions the situation of the parties may very properly be taken into view. The ties which connect the testator with the legatees; the affection subsisting between them; the motives which may reasonably be supposed to operate with him and to influence him in the disposition of his property, are all entitled to consideration in expounding doubtful words, and in ascertaining the meaning in which the testator used them."

To the same effect is *McCabe* v. *Cary*, 135 Va. 428, 116 S. E. 485.

Indeed the Code of Virginia governs this case. Section 6485 tells us upon what a writ of fieri facias may be levied. It may be levied on "the goods and chattels of the person against whom the judgment is. The writ may be levied as well on the current money and bank notes, as on the goods and chattels of such person."

The right to levy upon money is statutory. Code, section 6501, tells us when the lien attaches.

It is true that in *Steele & Co.* v. *Brown*, 2 Va. Cas. 246, the general court said:

"A writ of fieri facias commands the sheriff of the goods and chattels of the debtor to make a certain sum or debt, recovered by the plaintiff. When he levies this execution on money found in the possession of the defendant, he is acting strictly within his percept, since money is a chattel,

and is in that respect unlike a bond, deed, or other chose in action."

This case has not since been cited, and the same court in *Rutherford* v. *Commonwealth*, 2 Va. Cas. 141, held that money was neither goods nor chattels.

In *Bennett* v. *Bradley*, 149 Va. 746, 141 S. E. 756, a testatrix gave her "effects" to a beneficiary. We said that this word "does not suggest to the lay mind the idea of money, bonds, stock, etc., and the testatrix did not have in mind that class of intangibles when she disposed of her personal effects."

In *Hollywood Cemetery Co.* v. *Commonwealth*, 123 Va. 106, 96 S. E. 207, the court speaks of the accumulated funds of the Cemetery Company as intangible personal property.

Conceding for the sake of argument that this question was once debatable, it has now been removed from the domain of doubt.

Under Constitutional changes brought about by amendments in 1928, sections 168 and 171, property has been classified for assessment local and State. Intangible personal property has been set aside as a source of State revenue, among which is money; and this classification bears the imprint of legislative approval. Tax Code, sections 68, 70 and 283.

Construction lies only in the domain of ambiguity. When this testatrix gave to her nieces "all tangible personal property in my dwelling house," she gave to them something which has a definite meaning under our Constitution, statutes and decisions.

Evidence offered on the theory that it was the intention of the testatrix to give to her nieces all of the personal property in her dwelling would be inadmissible as contradicting the plain letter of her will. One cannot build a theory in a vacuum. There is no evidence to support it, and any which tended to support it would be incompetent. "Tangible" and "intangible" have definite meanings in Virginia, and when used technically by an able lawyer, expert in the

drafting of Virginia wills, they cannot be confused or distorted into a synonym. If this testatrix had given to her nieces the Royal Worcester in her dwelling, plainly that could not be extended to include Dresden China. As a matter of fact, there is nothing in the record to show that the testatrix had any such purpose in her mind. The whole record is against it.

As I see it, we might have adopted in toto the able opinion of Judge Bazile, copied into the record.