TRUSTEES OF THE DIOCESE OF EAST CAROLINA v. TRUSTEES OF THE DIOCESE OF NORTH CAROLINA.

*Religious Societies—Episcopal Church—Division of Diocese of North Carolina— Will—Construction of.*

Until 1883 the Protestant Episcopal Church in the State of North Carolina constituted the Diocese of North Carolina. In that year, in accordance with the Constitution and Canons of the Church, a Diocese, known as *East Carolina*, was constituted out of part of the territory of the Diocese of North Carolina, and the Church in the residue of the territory retained the name of *The Diocese of North Carolina.* In 1881 M. R. S. executed a will, by which she devised certain of her property "to the Board of Trustees for the Protestant Episcopal Church in the Diocese of North Carolina," and died in 1885: *Held,* that the object of the testator's bounty was the Episcopal Church in the State of North Carolina, and the Diocese of East Carolina is entitled to share with the present Diocese of North Carolina in the property.

This was a CONTROVERSY, submitted to the Court without action, as allowed by the statute (*The Code,* § 376), and tried before *Graves, J.,* at February Term, 1889, of the Superior Court of WAKE.

The following is a copy of the case agreed upon:

The parties above named, plaintiffs and defendants, claiming rights and interests which are mutually disputed and denied, and desiring to have the same legally and amicably settled and adjusted, do submit to your Honor this controversy without action, upon the facts hereinafter stated, which are mutually admitted and agreed:

1. That the Protestant Episcopal Church in the United States is, and for many years has been, a collective unincorporated body or society of Christian men, united and organized under laws established by themselves for the worship and service of Almighty God, and the promotion of the Christian religion.

2. That the said Church is divided into Dioceses having a greater or less territorial extent, and known by a certain name or designation, each Diocese being presided over by a Bishop regularly and duly consecrated according to the laws and ceremonies of the said Church, and each Diocese is divided into a greater or less number of parishes or congregations.

3. That the ultimate jurisdictional authority of the said Church in each Diocese is vested in a Diocesan Convention or Council, composed of clerical and lay delegates from each parish, and presided over, *ex-officio*, by the Bishop, which assembles annually for the regulation and government of the affairs of the Church within the Diocese.

4. That the ultimate jurisdictional authority of the said Church for the whole of the United States is vested in a General Convention, which is composed of a House of Bishops, consisting of all the Bishops of the said Church in the United States, and a House of Clerical and Lay Deputies, elected by the Diocesan Convention or Council of each Diocese; and which General Convention assembles every third year.

5. That by the Constitution of the said Church, article 5, it is provided as follows:

" Whenever the division of a Diocese into two or more Dioceses shall be ratified by the General Convention, each of the Dioceses shall be subject to the Constitution and Canons of the Diocese so divided, except as local circumstances may prevent, until the same be altered in either Diocese by the Convention thereof."

6. That by the General Canons adopted for the government of the said Church it is provided as follows:

" CANON IV.

" SECTION 1. Whenever any new Diocese shall be formed within the limits of any other Diocese, * * * and

the same shall have been ratified by the General Convention, the Bishop of the Diocese within the limits of which another is formed \* \* \* shall thereupon call the Primary Convention of the new Diocese, for the purpose of enabling it to organize, and shall fix the time and place of holding the same, such place being within the limits of the new Diocese.

"SEC. 4. Whenever the formation of a new Diocese shall be ratified by the General Convention, such new Diocese shall be considered as admitted, under article 5 of the Constitution, so soon as it shall have organized in Primary Convention in the manner prescribed in the previous sections of this Canon, and the naming of the new Diocese shall be a part of its organization."

7. That prior to the year 1883 the Protestant Episcopal Diocese of North Carolina embraced the whole territory of the State of North Carolina.

8. That at the Annual Convention of the said Church in the Diocese of North Carolina, which assembled in the month of May, 1883, the following resolution was duly adopted and passed, to-wit:

"*Resolved*, That, the General Convention assenting, a new Diocese be formed out of the present Diocese of North Carolina, consisting of counties of Hertford, Bertie, Martin, Pitt, Greene, Wayne, Sampson, Cumberland and Robeson, and of all the counties lying between those counties and the Atlantic Ocean."

9. That at the said Diocesan Convention of 1883 the following additional resolutions were also duly adopted and passed:

"*Resolved* 1. That the Convention hereby ratifies and confirms the action of the Convention of 1882 in regard to the expediency of a division of the Diocese.

"*Resolved* 2. That the Bishop is hereby respectfully requested to give his consent to the formation of the proposed new Diocese; and, in case such assent shall be given, the Deputies from this Diocese to the General Convention to be held in October next are hereby instructed to take the necessary steps for securing the consent of the General Convention to the erection of a new Diocese within the limits of the present Diocese of North Carolina, as described in the foregoing resolution.

"*Resolved* 3. That the securities and property of all descriptions at present constituting the 'Permanent Episcopal Fund,' the fund for 'Education of Children of Deceased Clergymen,' and the 'Fund for Relief of Disabled Clergymen and Widows and Orphans of Deceased Clergymen,' with such additions thereto as may accrue up to the date of the organization of the new Diocese, shall be divided equally, dollar for dollar, between the two Dioceses within this State, as may be agreed upon by a joint committee of four laymen, of which committee two members may be appointed by the Convention of each of the two Dioceses concerned."

10. That the Bishop of the Diocese of North Carolina consented to the formation of the said new Diocese, with the territorial limits above set forth, and the General Convention of the said Church, in October, 1883, duly and legally ratified the same as required by the canons aforesaid.

11. That afterwards, on the 12th day of December, 1883, the Primary Convention of the said new Diocese, which had been duly called according to the requirements of the said canons, assembled at Newbern, within the limits of the new Diocese, which was the place legally fixed for such assembly, according to the said canons, and the said new Diocese was thereby fully, duly and legally established and organized by the name of the Diocese of East Carolina, and the plaintiff, Alfred A. Watson, was duly elected Bishop thereof, and

has been duly consecrated to the said office, and has entered on the discharge of his duties.

12. That the formation, as aforesaid, of the said Diocese of East Carolina was occasioned solely by motives of policy for the well-being of the Church, and not by any disputes or differences in matters of faith, doctrine, discipline, form of worship or polity, all of which continued to be the same, without alteration, in both of the Dioceses, as they had been before the division. And the said creation and organization of the new Diocese were made and done in strict conformity with the law and usage of the said Church.

13. That before the formation of the said new Diocese, to-wit, in the month of February, 1881, Miss Mary Ruffin Smith, of Orange County, in the State of North Carolina, duly made and published her last will and testament in writing, a copy of which is hereunto annexed, and is to be taken as part of this agreed statement of facts.

14. That after the formation of the said new Diocese, to-wit, on the 13th of November, 1885, the said Mary R. Smith died, without having revoked or in anywise altered her said will, and on the ____ day of November, 1885, the said will was duly admitted to probate before the Clerk of the Superior Court of Orange County, and the defendant, Kemp P. Battle, the executor therein named, was duly qualified as such, and received into his possession a large amount of personal property belonging to the estate of his testatrix.

15. That the plaintiffs are the trustees, duly and lawfully appointed under the laws of this State, for the purpose of taking and holding the title and managing the property of the Protestant Episcopal Church in the Diocese of East Carolina; and the defendants Theodore B. Lyman, Richard H. Battle and William E. Anderson are the trustees in like manner duly and lawfully appointed for similar purposes in the Diocese of North Carolina, and were such trustees before the formation of said new Diocese of East Carolina.

16. That in and by her said will the said Mary R. Smith devised and bequeathed as follows, to-wit:

" (1.) I devise the tract of land on which I reside, about 1,500 acres, of several tracts originally, but now used as one tract, including all the land in Orange County I own, outside of Chapel Hill, and also all the stock and farming implements used on said land, to my dear friend, Maria L. Spear, during her life, and after her death, to the Board of Trustees for the Protestant Episcopal Church in the Diocese of North Carolina, appointed to hold the property of the Diocese not otherwise provided for by the General Convention of said Diocese, as authorized by act of the General Assembly of North Carolina in such case made and provided, said trustees to have full power to dispose of the same in fee simple and absolutely as said Convention may direct, specially, or by general ordinance; this devise, however, subject to the exceptions hereinafter mentioned.

" (2.) Out of the aforesaid tract I devise to Cornelia Fitzgeral, wife of Robert Fitzgeral (colored), for her life, free from the control or debts of her said husband—after her death, to her children—one hundred acres out of the aforesaid tract.

" (3.) I devise to Julius Smith (colored) likewise, out of the tract of land on which I now live, twenty-five acres in fee.

" It is my will that the devise to Cornelia Fitzgeral and to Julius Smith shall take effect at my death, and the tract given them be good land, equal to the average of the whole tract, with a fair proportion of wood and arable land, and to be laid off by metes and bounds by three white commissioners, one to be chosen by the said trustees of the Church, the other by the devisee or devisees interested—the mother, if living, to choose for herself and children—and those two to choose a third; my executor to make conveyances according to the report of the said commissioners (or a majority of them, whose report shall be final) and the terms of this will.

"(6.) Whatever of my kitchen and household furniture Miss Maria Spear wishes to have, I bequeath to her absolutely; what she does not want I give to Cornelia Fitzgeral, Emma Morphis, Annette Kirby and Laura Tirle (all colored), equally to be devided between them.

"(7.) I bequeath, out of any money on hand or due me, to Ed. Cole (colored), one hundred dollars, and to my namesake, Mary Ruffin Smith, daughter of Rev. Columbus Smith, deceased, of Mississippi, two hundred dollars. The residue of all moneys due me, and also any property not specifically willed, I give to the trustees of the Episcopal Church aforesaid in trust for the Diocese of North Carolina."

17. That Maria L. Spear, the devisee for life in the said will, is dead, having died before the testatrix.

18. That a large amount of personal property, constituting the residue of the estate above mentioned, has come into the hands of the defendant Kemp P. Battle as executor, and is now held by him as a part of said estate, and subject to the trusts of the said will.

1. Upon the foregoing facts the plaintiffs claim that they are entitled to an equal divison of all the real and personal estate devised and bequeathed by the said will to the Trustees of the Diocese of North Carolina in trust for the Church in said Diocese.

2. If not entitled to an equal division, then they claim that they are entitled to such a proportion of the said real and personal estate as the whole number of members and pew-holders of the said Church, in the Diocese of East Carolina, at the time of the organization thereof, bore to the whole number of the members and pew-holders in the present Diocese of North Carolina at that time.

These claims are denied by defendants, who insist that all of the said real and personal estate legally belongs to the defendants, the trustees of the *present* Diocese of North Carolina, in trust for the Church in said Diocese.

And these conflicting claims are respectfully submitted to the adjudication of the Court upon the foregoing agreed statement of facts.

Whereupon, the Court gave judgment for the plaintiffs, whereof the following is a copy:

. "Upon consideration of the agreed facts set forth as the basis of this controversy without action, and the cause having been debated by counsel on both sides, it is considered, adjudged and decreed by the Court that the plaintiffs are entitled to share in all the real and personal estate devised and bequeathed by will of Mary Ruffin Smith to the Board of Trustees of the Protestant Episcopal Church in the Diocese of North Carolina; and that the said real and personal estate be equally divided between the plaintiffs and the defendants, the Trustees of the Diocese of North Carolina.

"It is further adjudged, that an account be taken of the personal estate in the hands of the defendant, Kemp P. Battle, as the executor of said Mary R. Smith, and belonging to the residue bequeathed to the Board of Trustees for the Diocese of North Carolina; and the parties may agree on a referee for that purpose."

From this judgment the defendants, having excepted, appealed to this Court.

*Messrs. Geo. Davis* and *John Hughes,* for the plaintiffs.
*Messrs. John Manning* and *R. H. Battle,* for the defendants.

MERRIMON, J. (after stating the case). The Protestant Episcopal Church in the United States is an organized body of Christian people, and in its ecclesiastical organization it has a constitution, canons, rules and regulations for its government. It is divided into Dioceses, each designated by an appropriate name, and having greater or less territorial extent. It has existed in this State for a long period of time—about

102—29

a hundred years—and prior to 1883, the whole territory of this State was designated as the Diocese of North Carolina. Under the statute (*The Code*, § 3665), the church thus organized was capable of taking and holding property of every kind by purchase, gift, grant or will, and it is provided as to such cases, that "the estate therein (the property) shall be deemed and held to be absolutely vested, as between the parties thereto, in the trustees, respectively, of the said churches, denominations, societies and congregations, for their several use, according to the intent expressed in the conveyance, gift, grant or will; and in case there shall be no trustees, then in the said churches, denominations, societies and congregations, respectively, according to such intent."

Thus the devisee of the will and of the particular devise under consideration had certainty and distinctiveness of character and capacity to take and hold the property devised. The testator must be deemed to have known and understood the nature, the constituent elements, the purposes and territorial extent of the collective object of her bounty. She knew that it was a subdivision of the Protestant Episcopal Church in the United States; that it was composed of all the clergy and laity of that Church within the limits of this State. Having such knowledge, she "duly made and published her last will and testament in writing," in the month of February, 1881 (the material parts of which are above set forth), whereby she devised and bequeathed the property in question "to the Board of Trustees for the Protestant Episcopal Church in the Diocese of North Carolina," &c. If this were all of the matter, there could be no question as to the intention of the testatrix; the whole Church within the State would share in her bounty without distinction.

But afterwards, in 1883, a new Diocese, designated as the Diocese of East Carolina, was created, strictly as allowed by the canons and usages of the Church, having prescribed boundaries, within the Diocese of North Carolina, the latter

retaining its name unchanged.   The formation of the new Diocese " was occasioned only by motives of policy, for the well-being of the Church, and not by any disputes or differences in matters of faith, doctrine, discipline, form of worship or polity, all of which continued to be the same, without alteration, in both Dioceses, as they had been before the division."

The testatrix, having executed her will in 1881, continued to reside and have her domicile within the Diocese of North Carolina until her death, on the 13th of November, 1885. She never resided within the new Diocese.   The appellants contend—first, that, properly interpreting the devise, it is exclusively to the Diocese of North Carolina as it is now constituted; and secondly, that the clergy and laity of the new Diocese, having voluntarily abandoned the old one, must be treated as having abandoned or lost any possible right they may have had under the will in question.

We are of opinion that these contentions are not well founded, and that the judgment must be affirmed.   The intention of the testatrix in disposing of the property in question, as expressed in her will, and not otherwise, must prevail.   The Court has no authority to look beyond the will in ascertaining its true meaning, and consider what she may have said before or after its execution, at one time or another, or to one person or another, as to her intention. This must be ascertained from the will itself—its reference to the property disposed of, and the persons to whom, or organization to which, it is devised and bequeathed.   The very purpose of putting it in writing was to declare and express her settled intention as to the property in a solemn and unequivocal manner, and thereby provide certain and permanent evidence of it, not to be thereafter altered or modified, except by an intentional destruction of the will by herself or by her direction, or by a codicil thereto, or by a subsequent one properly executed.   Nor could the changed

condition or circumstances of the devisee and legatee surviving, subsequent to the execution of the will, change or affect the intention of the testatrix as therein expressed, as to the property embraced by it, in the absence of any provision contemplating such change, except as such intention may be in such case affected by some rule of law or statutory provision. This must be so, because the intention, once expressed in the will, could not be effectually changed otherwise than by one of the ways above indicated.

Then, what was the intention of the testatrix as to the property in controversy? The will was executed in 1881. At that time the Diocese of North Carolina embraced the whole territory of this State; that of East Carolina did not then exist—so far as appears, it had not been thought of. The devise was " to the Board of Trustees *for the Protestant Episcopal Church* in the Diocese of North Carolina." Obviously, she had in view, and intended at the time she executed her will, the whole Church within this State, and not that part of it in one section or locality more than another; she said so in express terms; she could not have intended or contemplated a subdivision such as has come about since 1881, because none existed, and the language employed does not imply or suggest any such thing. The devise is not to the Diocese as such, nor to the Board of Trustees for it as a Diocese, but to *the Church—to the Trustees for the Church*— within the Diocese. And upon the death of the testatrix, the statute above recited vested the property in the Trustees for the Church, and, in the absence of Trustees, directly in the Church itself. The statute so expressly provides. The mere subdivision of the Diocese—the change of its boundaries or its name—could not change or render the devise inoperative; the Church would remain sufficiently designated and identified, and the Church, and not the Diocese, was the religious organization to be benefited. If, in the division of the Diocese of North Carolina into two parts, one part had been

called the Diocese of West Carolina and the other East Caro-
lina, this would not have affected the devise adversely,
because the Church, the real object contemplated, sufficiently
designated, remained to take and be benefited.   The Dio-
cese was not the Church, nor an essential part of the devise—
it was only a part of the machinery of the Church, through
which it effected its purposes, that might be changed, modi-
fied, or dispensed with, as. to its name and territorial extent,
or altogether, by the proper ecclesiastical authority ; this
could be done without affecting the entirety of the Church
generally, or in a particular locality, or within a fixed boun-
dary.   Hence, the testatrix, in making her will, had in view,
and intended to benefit, not the mere name and form of
church organization, but " the Protestant Episcopal Church "
within North Carolina ; and neither the Church nor the
Diocese could change or give direction to her intention, as
expressed in her will, by anything they could do.   She alone
had the right to designate the object of her bounty, and that
object, as a whole, has the right to accept and take benefit of
it, accordingly as she directed in the devise, although, for
its convenience and advantage, it has changed its name,
bounds and relations, not affecting materially its nature and
substance, since the execution of the will.

There is nothing in the will, or in the particular devise
under consideration, that indicates the slightest purpose, on
the part of the testatrix, to modify, limit or restrict at all, the
devise, in the contingency that the Diocese should be divided,
or in any other contingency.   It is unrestricted and abso-
lute as to the devisee to be benefited.

It was said on the argument that the Diocese of North
Carolina continued to exist at the time of the death of the
testatrix, and therefore, the devise should be construed as
applying to it as it existed at that time.   This argument is
specious, but certainly not sound.   It is true, that Diocese
existed at that time in name, but it was not the same in ter-

ritorial extent, nor did it then embrace a very large and sub-
stantial part of the certain and well defined object embraced
by the intention and purpose of the testatrix as expressed in
her will. At the time of her death, a large part of the
Church which she clearly intended to benefit had been
detached from the Diocese, and nothing appears, in terms or
by reasonable implication, in the will, to show that she
intended to modify her expressed purpose so as to exclude
the detached part of the Church. This Church within North
Carolina—within the Diocese embracing the whole State—
as she contemplated it at the time she made her will and
therein expressed her intention, continued in all material
respects to exist at the time of her death just as it did at the
time she made her will—it had only been changed into two
Dioceses instead of one; the Church as defined and specified
in the will remained the same, capable of taking benefit
under the devise as contemplated and intended by the tes-
tatrix. As is said above, the mere division of the Diocese
could not modify or defeat her intention. This was settled
and expressed, not to be modified except in one of the ways
already specified, at the time she executed her will. *Rich-
mond* v. *Vanhook*, 3 Ired. Eq., 581; *Tayloe* v. *Bond*, Busb. Eq., 5
(18); *Garrett* v. *Niblock*, 1 Rus. Myl., 629; *Parker* v. *Merchant*,
1 Young and Cally, 299; *Bonlow* v. *Rignold*, 8 How., 131;
1 Red. on Wills, 384, par. 9.

Nor can that part of the Church embraced by the new
Diocese of North Carolina be deemed and treated as having
lost, abandoned or forfeited its right to have benefit of the
devise. The division of the Diocese of North Carolina was
made by common consent of the clergy and laity of the
Church within it, for the common good of the Church and
its purposes, strictly as allowed by and in accordance with
its canons and usages; it was not prompted by any spirit of
rivalry or insubordination, or dissent from the doctrines
of faith, the polity, usages or practices of the Church; there

was neither secession nor schism ; it continued, and continues now, to be in its substance, integrity, spirit and life, just as before the division and the creation of the new Diocese, and just as when the testatrix made her will. The Church within the Diocese of East Carolina is as certainly now within her intention and purpose, as expressed, as it was then ; it has done nothing to put itself without such intention or to forfeit its right to share in the devise ; it has done nothing in the eye of the Church or the law that was or is culpable, or that justly subjects it to censure in any respect. On the other hand, the creation of the new Diocese was praiseworthy and to be commended, because it was intended by and through it, as a legitimate instrumentality, to accomplish increased and great good. As the Church within it comes, as we have seen, within the purpose of the testatrix, we cannot discover the slightest reason why it should not share in her generous bounty to the Church of her choice. Why shall it not do so ? What has it done, in the eye of the law of the Church or law of the land, that prevents it from doing so ? We cannot conceive of a just reason why it may not. It might — no doubt would—be otherwise, if the clergy and laity of the new Diocese had abandoned the faith, doctrines, usages and practices of the Church—had seceded from it and set up an independent church organization. But it is not suggested that anything inimical to the Church, or at all improper, has been done by that part of it within the new Diocese.

The views we have expressed, it seems to us, are founded on principles of justice, and are fully sustained by numerous authorities cited by the learned counsel of the appellees in the course of his able argument, some of which we cite : *Smith* v. *Swormstedt*, 16 How. (U. S.), 288 ; *Ferrana* v. *Vasconcellas*, 31 Ill., 53 ; *Niccolls* v. *Rugg*, 47 Ill., 47 ; *Wiswell* v. *The Church*, 14 Ohio St. R., 44 ; *Gaston* v. *Penick*, 5 Bush. (Ky.), 110 ; *Hale* v. *Everett*, 53 New Ham., 80 ; *Friends* v. *Friends*, 89 ; *ibid.*, 136.

It seems to us, that the authorities in respect to the division of counties, towns and the like, cited on the argument by the learned counsel for the appellants, have no proper application in this case. In those and like cases, simple rules of law applicable determine the rights and liabilities of the county or town and the detached parts thereof. In this case, the *intention* of the testatrix, expressed in her will, not inconsistent with established rules of law, settles, directs and controls the right of the Diocese of North Carolina, and the detached part thereof forming the new Diocese, as to the property embraced by the devise in question. If the devise were to a county, and, pending the life-time of the testator, a part of the county were detached and made a new county, or part of another, the detached part would certainly share in the property devised, if it should appear that the testator so intended; and this is so, because his intention must prevail, if it be lawful and practicable.

It has been suggested that the testatrix really intended that the present Diocese of North Carolina alone should have benefit of the devise. This, if so, can avail nothing. As we have already said, we can only know her intention as expressed in her will. If she so intended, she ought to have modified the devise by a codicil, or in some other effectual way. But with her change of purpose, if she had one, we have nothing to do. We cannot doubt that we have properly interpreted her intention as expressed in her will.

In view of the interpretation we have given of the devise in question, there is no objection to the judgment appealed from; and so, it must be affirmed.

By consent of the parties, the costs of this controversy must be paid by the defendant executor out of any fund arising from the sale, rents or hires of the property, or any part of it.

No error.                              Affirmed.