GERALD L. BALILES, ATTORNEY GENERAL OF
VIRGINIA, ET AL.

V.

GILES H. MILLER, JR., ETC., ET AL.

Record No. 821813

AMERICAN HEART ASSOCIATION, VIRGINIA AFFILIATE,
INCORPORATED

V.

GILES H. MILLER, JR., EXECUTOR, ETC., ET AL.

Record No. 821815

THE RECTOR AND VISITORS OF THE UNIVERSITY OF
VIRGINIA, ET AL.

V.

GILES H. MILLER, JR., EXECUTOR, ETC., ET AL.

Record No. 821817

March 7, 1986

Present: Carrico, C.J., Poff, Compton, Stephenson and Russell, JJ., and Harrison and
Gordon, Retired Justices.

50

*Kenneth W. Thorson, Senior Assistant Attorney General (Gerald L. Baliles, Attorney General*, on brief), for appellants (Record No. 821813).

*J. Sloan Kuykendall; John E. Wetsel, Jr. (J. Sloan Kuykendall, III; Kuykendall, Wetsel & Kuykendall, P.C.*, on brief), for appellees Anne Meade Smith Faulconer, Frances Smith Conoly Bedell, Mark Coxe Prime, Joan Prime and Jane Fletcher Higgins (Record No. 821813).

No brief or argument on behalf of appellees Giles H. Miller, Jr., in His Own Right and as Executor of the Estate of Virginia Fletcher Wood, Deceased, James W. Fletcher, Joan Coxe Lange, American Heart Association, Virginia Affiliate, Incorporated, Rector and Visitors of The University of Virginia and The Medical College of Virginia, Health Sciences Division of Virginia Commonwealth University (Record No. 821813).

*Gregory N. Stillman (Hunton & Williams*, on briefs), for appellant (Record No. 821815).

*J. Sloan Kuykendall; John E. Wetsel, Jr. (J. Sloan Kuykendall, III; Kuykendall, Wetsel & Kuykendall, P.C.*, on brief), for appellees Anne Meade Smith Faulconer, Frances Smith Conoly Bedell, Mark Coxe Prime, Joan Prime and Jane Fletcher Higgins (Record No. 821815).

No brief or argument on behalf of appellees Giles H. Miller, Jr., Executor of the Estate of Virginia Fletcher Wood, Deceased, James W. Fletcher, Joan Coxe Lange, The Medical College of Virginia, Health Sciences Division of Virginia Commonwealth University, The Rector and Visitors of the University of Virginia, Attorney General of Virginia and Parties Unknown Who May Be Infants or Incompetents (Record No. 821815).

*Roger S. Martin (George G. Grattan, IV; David L. Ross*, on briefs), for appellants (Record No. 821817).

*J. Sloan Kuykendall; John E. Wetsel, Jr. (J. Sloan Kuykendall, III; Kuykendall, Wetsel & Kuykendall, P.C.*, on brief), for appellees Anne Meade Smith Faulconer, Frances Smith Conoly Bedell, Mark Coxe Prime, Joan Prime and Jane Fletcher Higgins (Record No. 821817).

No brief or argument on behalf of appellees Giles H. Miller, Jr., Executor of the Estate of Virginia Fletcher Wood, Deceased, American Heart Association, Virginia Affiliate, Incorporated, James W. Fletcher, Joan Coxe Lange, Parties Unknown and Par-

ties Unknown Who May Be Infants or Incompetents (Record No. 821817).

POFF, J., delivered the opinion of the Court.

We granted and consolidated these appeals, each challenging the chancellor's holding that one of the two bequests in a residuary clause was void for indefiniteness. The appellees are Giles H. Miller, Jr., in his own right and as Executor of the Estate of Virginia Fletcher Wood, deceased, and five of the seven heirs-at-law of the testatrix.[1] The appellants are Gerald L. Baliles, Attorney General of Virginia, Commonwealth of Virginia;[2] The Medical College of Virginia, Health Sciences Division of Virginia Commonwealth University and The Rector and Visitors of the University of Virginia (collectively, the Universities); and American Heart Association, Virginia Affiliate, Incorporated (Virginia Affiliate).

Virginia Fletcher Wood (testatrix) and her husband, Robert Eugene Wood, died on the evening of August 28, 1979. Their car stalled on a bridge over the Thornton River during a flash flood, and both were drowned. Mr. Wood left a holographic will dated February 20, 1948, which read in pertinent part:

> I . . . leave my entire estate . . . to my (wife) Virginia Fletcher Wood . . . .
> In the event my (wife) Virginia Fletcher Wood and myself die at the same time I leave my estate as follows:
>
> . . . .
>
> 2nd The balance of my estate is to be divided between the canser [sic] and heart funds of Virginia.

Mrs. Wood also left a holographic will dated December 4, 1948. Only four paragraphs are relevant to this appeal:

---

[1] The appellees, Anne Meade Smith Faulconer, Frances Smith Conoly Bedell, Mark Coxe Prime, Joan Prime, and Jane Fletcher Higgins, appear on brief "on their behalf and on behalf of the other unrepresented heirs-at-law", viz., James W. Fletcher and Joan Coxe Lange. The seven heirs are the testatrix's cousins.

[2] The Attorney General, a defendant below, appears as counsel charged with the duty to render legal service to the Commonwealth in the conduct of civil litigation. Code § 2.1-121.

Second; I give all my property, both real and personal, with the exception of five thousand dollars, in fee simple, to my husband, Robert Eugene Wood, if he be living at my death.

Third; I give to Giles H. Miller, Jr. the sum of five thousand dollars, if he be living at the time of my death . . . .

. . . .

Sixth; If Robert Eugene Wood, my husband be not living at the time of my death, or if our deaths should occur at the same time, I wish my estate divided as follows:

I leave twenty five thousand dollars to my friend and a good friend of my father, Giles H. Miller, Jr., if he then be living . . . .

. . . .

All the rest and residue of my estate I wish be divided equally into two parts. One part I wish and direct go to the Virginia Division of the American Cancer Society; the other part I wish and direct to go to the State of Virginia Organization or Foundation engaged in research concerning ailments of the Heart and Heart Trouble.

Appellee Miller offered both wills for probate, qualified as executor of each, and filed separate suits seeking the advice and guidance of the court in the administration of the estates. The chancellor consolidated the suits for trial and heard evidence *ore tenus*. The parties agreed that the decedents had died simultaneously (*see* Code § 64.1-97), and the issue focused primarily upon the residuary clauses of the two wills.

Reserving a ruling on objections, the chancellor permitted Ralph Deacon to testify concerning certain conversations he had held with the Woods during the year preceding their deaths. Deacon testified that he had urged Mr. Wood to consider making a gift or a bequest to Bridgewater College or to Culpeper Memorial Hospital "to build a Fletcher-Wood memorial wing". Mr. Wood told Deacon that "they had a will", that they "had left half of [their money] to the Cancer Fund, half of it to the Heart Fund", and that they were concerned that their money not "go to New York, to the National Association, and be squandered there". "He also made the comment," Deacon said, "that he didn't have any close relatives, and he didn't want any of his relatives to have any." Mrs. Wood was present during some of these conversations.

"Her concerns," Deacon stated, "were the same as Gene's, yes. She expressed that they had left it half to the Heart Fund, half to the Cancer Fund, and, again, they were concerned about the organization."

Evidence was adduced to show that, at the time the Woods drafted their wills, the Virginia Division of the American Cancer Society was popularly known as "the Cancer Society" or "the Cancer Fund." An officer of the American Heart Association testified that "[t]he Heart Fund . . . is a name that was given to us by the public and the media", that this name was later registered as a trademark, and that the Virginia Affiliate, formally incorporated in 1949, was authorized to use the name. The evidence showed that the Universities were engaged in cardiovascular research at the time the wills were written, and the chancellor found that the Virginia Affiliate "funds such research and in a broader sense itself engages in such research".

In a letter opinion, the chancellor ruled that it was "appropriate to consider all of the evidence adduced . . . except to the extent that Mr. Wood made declarations as to his wife's testamentary intent even in the presence of Mrs. Wood or where he referred to their joint intentions and except as to declarations made by Mrs. Wood . . . ."

With respect to Mr. Wood's bequest to "the canser [sic] and heart funds of Virginia", the chancellor ruled that "extrinsic evidence of facts and circumstances is admissible, and that such evidence does resolve the ambiguity". Accordingly, he held that Mr. Wood's residuary estate "must pass to the American Cancer Society, Virginia Division, Incorporated and the American Heart Association, Virginia Affiliate Incorporated to be divided equally."[3]

Concerning Mrs. Wood's bequest to "the Virginia Division of the American Cancer Society", the chancellor held that "one-half of the net residuary estate . . . shall be paid over and delivered to the American Cancer Society, Virginia Division, Inc. . . ."[4] However, construing her bequest to "the State of Virginia Organization or Foundation engaged in research concerning ailments of the Heart and Heart Trouble", he concluded that he could not "seek the aid of Mr. Deacon's testimony to resolve the uncertainty", that "this provision must fail for indefiniteness", and that

---

[3] This construction of Mr. Wood's testamentary intent was not challenged on appeal, and the holding has become final.

[4] This holding is not in issue on appeal.

"the remaining one-half net residuary estate . . . shall vest in the heirs-at-law of Virginia Fletcher Wood, deceased."

All appellants assign error to this portion of the final decree. In substantial part, the Attorney General and the Universities reason together as follows: Mrs. Wood's testamentary intent was manifestly charitable, and charitable bequests are viewed with peculiar favor by the courts. *See Thomas* v. *Bryant,* 185 Va. 845, 852, 40 S.E.2d 487, 490 (1946). A gift for a charitable purpose may create a charitable trust even though the donor does not name the donee as trustee or provide expressly that the gift is to be held in trust. *See Wellford* v. *Powell,* 197 Va. 685, 90 S.E.2d 791 (1956). In such a case, a court is authorized by Code § 55-29[5] to appoint a trustee to carry out the charitable purpose. The doctrine of *cy pres* as defined in Code § 55-31[6] applies to charitable trusts,

[5] § 55-29. **Appointment of trustees to hold such gifts, etc.; suits by and against them; settlement of their accounts and enforcement of the execution of the trust.** — When any such gift, grant or will is recorded and no trustee has been appointed, or the trustee dies or refuses to act, the circuit court of the county or the circuit or corporation court of the city in which the trust subject or any part thereof is, in the case of a gift or grant, or in which the will is recorded, may, on motion of the attorney for the Commonwealth in such court (whose duty it shall be to make such motion), appoint one or more trustees to carry the same into execution. The trustees, whether appointed by, under, or by authority of such instrument, or under a charter of incorporation granted for the purpose of carrying out its provisions or under this section, may sue and be sued in the same manner as if they were trustees for the benefit of a certain natural person, or as such charter of incorporation may provide. The trustees shall annually render and state before the commissioner of accounts for the county or city wherein the trust subject, or the greater part thereof, is situated an account showing the investment of the trust funds, the receipts from such investment, or from other sources, and the disbursements of the same, in like manner as is required of every personal representative, guardian, curator, or committee, under chapter 2 (§ 26-8 et seq.) of Title 26. In enforcing the execution of any such trust a suit may be maintained against the trustees in the name of the Commonwealth when there is no other party capable of prosecuting such suit. The term "trustees" as herein used shall be construed to mean the persons, or governing body, charged with the execution of the trust, whether designated as "trustees," "directors" or otherwise. A motion under this section may be made before any court in the clerk's office of which such gift, grant or will is recorded.

[6] § 55-31. **Indefiniteness not to defeat certain trusts.** — When any corporation, firm, association, partnership or person gives, bequeaths, grants, conveys or devises any real or personal property in trust to or for any educational, charitable or eleemosynary purpose, the indefiniteness or uncertainty of the beneficiaries named in any instrument creating such a gift, bequest, grant, conveyance or devise, or the indefiniteness of the purpose of the trust itself, shall not defeat any such trust and, if the trust is in other respects valid under the laws of this State, it shall be administered to conform as near as may be to the purpose for which created or, if impossible of performance for this purpose, for some other educational, charitable, benevolent or eleemosynary purpose. However, unless the maker of the trust has

whether created expressly or by implication. Alternatively, the principle of "equitable approximation", *see Thomas* v. *Bryant, supra,* or the common-law doctrine of *cy pres*[7] should be applied to sustain Mrs. Wood's charitable bequest.

The heirs contend that "[i]t has never been held in Virginia that a gift, arguably clothed in charitable terms, creates an implied trust"; that Code § 55-29 "is purely a procedural statute and cannot be elevated to the dignity of a substantive *cy pres* statute"; that statutory *cy pres* as defined in Code § 55-31 applies only to express trusts; and that the enactment of that statute "implicitly precludes the adoption of a broader [common-law] view by the courts of this state."

The Virginia Affiliate does not address the arguments regarding trusts, equitable approximation, or statutory or common-law *cy pres*. Nor do we find it necessary to do so. The Attorney General and the Virginia Affiliate contend, and we agree, that the chancellor erred in failing to consider evidence of Mrs. Wood's declarations of intent. Considering Deacon's testimony in context with the unity of purpose reflected by a comparison of the testamentary design of the wills executed by husband and wife, we are of opinion that Mrs. Wood intended to bequeath half of her residuary estate to the Virginia Affiliate.

We begin our analysis by reviewing certain established principles.

The only reason anyone can have for making a will is to change the devolution of his property from that prescribed by the statutes of descent and distributions. Hence there is a strong presumption that the testator intended to dispose of

specifically designated some other body, committee, agency or entity to determine what that purpose shall be and to administer the trust (in which event the determination and administration by that body shall be valid), the determination of the purpose of the trust shall be made by a court of equity in the county or city wherein the property or the greater part thereof is located and the administration of the trust shall be under the direction of such court.

The provisions of this section shall not apply to or affect any trust or fund which is the subject of pending litigation.

[7] The common-law doctrine of *cy pres* is defined in part in Black's Law Dictionary 349 (5th ed. 1979) as:

Equitable power which makes it possible for court to carry out testamentary trust established for particular charitable purpose if testator has expressed general charitable intent, and for some reason his purpose cannot be accomplished in manner specified in the will. *In re Gatlin's Estate,* 16 C.A.3d 644, 94 Cal.Rptr. 295, 296.

his entire estate, and courts are decidedly averse to adopting any construction of a will which leaves a testator intestate as to any portion of his estate, unless compelled to do so. The judicial expositor, therefore, starts out with this presumption.

*McCabe* v. *Cary's Ex'r.*, 135 Va. 428, 433-34, 116 S.E. 485, 487 (1923) (citation omitted).

All of the refinements of the law must yield to the power of the testator to dispose of his property as he desires. When this intention, which is the guiding star, is ascertained and can be made effective, the quest is ended and all other rules become immaterial.

*Wornom* v. *Hampton N. & A. Inst.*, 144 Va. 533, 541, 132 S.E. 344, 347 (1926) (citation omitted).

Here, our special concern is with the rules of evidence which guide the judicial expositor in ascertaining testamentary intent. In his letter opinion, the chancellor cited *Coffman's Adm'r* v. *Coffman*, 131 Va. 456, 109 S.E. 454 (1921), where this Court considered the rules articulated by Professor Charles A. Graves in a paper he read at the annual meeting of the Virginia Bar Association in 1893. C. Graves, "Extrinsic Evidence in Respect to Written Instruments," 14 Va. L. Reg. 913 (1909) (hereinafter cited as *Graves*). As we distill the views of Professor Graves, we perceive three rules pertinent to our inquiry:

(1) If the language of a will is plain and unambiguous, extrinsic evidence is never admissible to contradict or alter its meaning.

(2) Extrinsic evidence of facts and circumstances, such as "the state of [the testator's] family and property; his relations to persons and things; his opinions and beliefs; his hopes and fears; his habits of thought and of language", *Graves* at 922, are "always admissible in aid of the interpretation of the will — *i.e.*, as explanatory of the meaning of the words as used by the testator", *Graves* at 923; and "the same doctrines should apply to all ambiguities, whether patent or latent, admitting evidence of the facts and circumstances in all cases, and of declarations of intention in the one case of equivocation", *Graves* at 942.

(3) An "equivocation" exists "where the words in the will describe well, but equally well, two or more persons, or two or more things", *Graves* at 926, and "all extrinsic statements by a testator as to his actual testamentary intentions — *i.e.*, as to what he has

done, or designs to do, by his will, or as to the meaning of its words as used by him", *Graves* at 922, are admissible to show which person or thing he intended and, thus, to resolve the equivocation.

Nothing in the decisions of this Court contradicts these rules, and we endorse them as the law of this Commonwealth.

■ Quoting at length from Professor Graves' paper, the chancellor gave special emphasis to the passage which stated that, in order for an equivocation to exist, "[t]he words of the will must be descriptive of concrete objects; that is, of some person or thing whose identification is the purpose of the declarations of intention. Such declarations are not now allowed . . . to explain the meaning of ambiguous expressions in a will . . . [or] to explain generic terms . . . ." *Graves* at 934. The chancellor found that the language employed by Mrs. Wood is "generic", concluded that no equivocation existed, and ruled that he could not consider Mrs. Wood's declarations of intention "to resolve the uncertainty".

We do not agree that the language of the will is "generic" in the sense of that word as "relating or applied to or descriptive of all members of a genus, species, class, or group". Webster's Third New International Dictionary (1971). The term "State of Virginia Organization or Foundation engaged in research concerning ailments of the Heart and Heart Trouble" is descriptive of a geographical segment of a larger class. It is particular rather than general.

■ The heirs argue that the term is *patently* ambiguous and that the only extrinsic evidence competent to resolve a patent ambiguity is evidence of facts and circumstances surrounding the making of the will. We agree with the chancellor's conclusion that Mrs. Wood's "description is *not on its face* applicable to two or more organizations or foundations". (Emphasis added). The words of her will describe a particular, concrete object, *viz.*, the organization or foundation engaged in cardiovascular research. The ambiguity is *latent*; the "uncertainty" to which the chancellor referred did not appear until the evidence disclosed that more than one organization or foundation was engaged in heart research.

As defined by Lord Bacon, 'a latent ambiguity is that which seemeth certain and without ambiguity for any thing that appeareth on the deed or instrument; but there is some

collateral matter out of the deed that breedeth the ambiguity.'

A latent ambiguity therefore exists in a sentence or expression only when the real meaning or intention of the writer is hidden or concealed. It does not appear on the face of the word[s] used nor is its existence known until those words are brought into contact with collateral facts. It is only when you come to apply the words, bringing them alongside the facts which existed when used, and to read them in the exact light in which they were written that you make up the latent ambiguity, if one exists.

*Hawkins* v. *Garland's Adm'r Et Als.*, 76 Va. 149, 152 (1882) (citations omitted). An equivocation which becomes apparent only when evidence discloses that the language of a will applies equally well to two or more persons or things fits this definition of a latent ambiguity.

■ "[T]he American courts have generally admitted declarations to resolve latent ambiguities as to the beneficiaries or the property devised, without regard to whether or not there was technically 'an equivocation.'" 94 A.L.R. 280 (1935). In *Grimes* v. *Crouch*, 175 Va. 126, 7 S.E.2d 115 (1940), the testator left a holographic will which read: "Ever thing left to sister for life times." *Id.* at 129, 7 S.E.2d at 116. The testator was survived by two sisters. The trial court admitted the evidence of a witness who testified that the testator told him that he "was accustomed to speak of his sister, Eva J. Crouch, as 'sister,' a term which he did not apply to his other sister, Mrs. Ridgeway." *Id.* at 131, 7 S.E.2d at 117. Although this Court made no reference to "equivocation", we held that "[t]he gift is to 'sister.' . . . Any latent ambiguity which might be caused by this incomplete designation has been wiped away by competent evidence." *Id.* at 136, 7 S.E.2d at 119 (citations omitted).

■ Even if, as the heirs insist, the ambiguity is patent rather than latent, Mrs. Wood's declarations of intention were admissible. Under the second rule we have excerpted from Professor Graves' paper, "the same doctrines should apply to all ambiguities, whether patent or latent, admitting evidence of the facts and circumstances in all cases, and of declarations of intention in the one case of equivocation." *Graves* at 942. *Accord* J. Thayer, "The 'Parole Evidence' Rule (II)," 6 Harv. L. Rev. 417, 424 (1893).

Applying the third rule we have approved, we hold that "the words in [Mrs. Wood's] will describe well, but equally well, two or more persons, or two or more things", *Graves* at 926; that an equivocation exists; and that the chancellor erred in excluding Deacon's testimony concerning Mrs. Wood's declarations of intention.

We must now construe the language of Mrs. Wood's residuary clause in light of those declarations and other facts and circumstances in evidence.

█ Preliminarily, we reject the suggestion that the term "State of Virginia Organization or Foundation" was intended to apply solely to governmental bodies. The language is in the disjunctive, and while each of the Universities is a state "Organization", neither is a "Foundation". We interpret the term to mean an organization or foundation operating within the State of Virginia. Deacon's testimony that the Woods did not want their money squandered in another state reinforces our interpretation.

█ From the evidence adduced by the Universities and the Virginia Affiliate, the chancellor found that these organizations and "likely . . . others not before the court" were engaged in heart research. In effect, this was a factual finding that the words in the will described equally well more than one Virginia organization. It is clear, however, that Mrs. Wood had in mind a specific organization or foundation engaged in heart research, for she made her bequest to "the . . . Organization or Foundation", and, significantly, she capitalized the nouns. Neither University introduced any evidence to show that it was the entity she had in mind. On the other hand, it appears that the Virginia Affiliate is the *one* Virginia organization engaged exclusively in heart research and the funding of heart research by other Virginia institutions.[8]

█ Citing *Tracy* v. *Herring*, 48 N.C. App. 372, 268 S.E.2d 875 (1980), and other cases, the Attorney General states on brief that "this is a proper case for construing the will of Virginia Fletcher Wood in light of her husband's will which was drawn some nine months earlier." We agree. A comparison of the two wills reveals parallels in structure and substance which support the conclusion that Mrs. Wood was familiar with the content and effect of her husband's will and shared his testamentary purposes.

---

[8] These include the University of Virginia, the Medical College of Virginia, Eastern Virginia Medical School, Old Dominion University, George Mason University, Fairfax Hospital, and the Veterans Administration Hospital in Richmond.

We believe this is a "fact or circumstance" within the meaning of the second rule we have borrowed from Professor Graves' paper.

Mr. Wood left his "entire estate" to his wife; Mrs. Wood left "all [her] property to [her] husband". Each made alternative bequests in the event one predeceased the other or both died simultaneously. Mr. Wood divided his residuary bequest between "the canser [sic] and heart funds of Virginia"; Mrs. Wood divided her residuary bequest between "the Virginia Division of the American Cancer Society" and "the State of Virginia Organization or Foundation engaged in research concerning ailments of the Heart and Heart Trouble".

The pattern of the two wills is similar. True, the language is different.[9] In our view, however, its import reflects an identity of testamentary intent on the part of husband and wife to make the same bequests to the same legatees for the same charitable purposes. And the declarations of intention reported by Deacon strengthen our view.

The chancellor held that Mr. Wood intended half of his residuary estate to pass to the Virginia Affiliate. Reading Mrs. Wood's will in context with that of her husband and considering Mrs. Wood's declarations of intention, we hold that Mrs. Wood intended the same and that the chancellor erred in declaring her bequest void for indefiniteness.

This does not end our inquiry. The chancellor ruled that the $5,000.00 and $25,000.00 legacies to Giles H. Miller, Jr., contained in Mrs. Wood's will "are cumulative, and not substitutional" and ordered that both be paid to the legatee. The Attorney General assigns error to that ruling.

We resolve this issue from the face of the will. Mrs. Wood obviously intended to divide her whole estate in one manner if her husband survived her and in a different manner if he did not. She wanted her husband, if alive, to have all her property except the $5,000.00 she wanted Miller to have. If her husband was dead, she wanted Miller to receive a larger legacy, $25,000.00, before the residue was paid to the charities she named. Thus, the two bequests, expressly separated by a common contingency, were mu-

---

[9] The evidence suggests the reason for the difference. At the time the wills were written, the Virginia Affiliate had not been given the proper name under which it was incorporated. Mr. Wood defined the two charitable organizations in the vernacular. Mrs. Wood was simply groping for more definitive language.

tually exclusive alternatives, and we hold that the chancellor erred in ruling that the legacies were cumulative.

Because "there is no sufficient evidence that the persons have died otherwise than simultaneously, the property of each person shall be disposed of as if he had survived", Code § 64.1-97, and the $5,000.00 legacy must fail.

Insofar as the chancellor held that Mrs. Wood's bequest of half of her residuary estate failed for indefiniteness and that the two legacies to Miller were cumulative, the final decree will be reversed, and we will enter final judgment here awarding the $25,000.00 legacy to Giles H. Miller, Jr., and one-half the net residuary estate of Virginia Fletcher Wood to the American Heart Association, Virginia Affiliate, Incorporated.

*Reversed and final judgment.*