## CIRCUIT COURT OF WESTMORELAND COUNTY

John L. Melnick,
Executor u/w
Martha Virginia Sanford,
Deceased

v.

Westmoreland County Volunteer Rescue Squad,
Montross Volunteer Rescue Squad, Inc., and
Colonial Beach Rescue Squad, Inc.

January 16, 1991

By JUDGE JOSEPH E. SPRUILL, JR.

This is a suit brought by the executor of the Estate of Martha V. Sanford to construe her will. Miss Sanford died in January, 1990. By her will, dated December 12, 1977, she devised her residuary estate "to the Rescue Squad -- Hague, Westmoreland County, Va."

There was not then, nor is there now, an official entity so named. There was then, and is now, the Westmoreland County Volunteer Rescue Squad (Westmoreland) based in the village of Mt. Holly, approximately five miles west of Hague.

Westmoreland claims it is entitled to the entire residuary estate because from the face of the will, it is apparent it is the only intended beneficiary.

In 1989, twelve years after the will was written but prior to the death of Miss Sanford, some members of the Westmoreland squad resigned and formed Montross Volunteer Rescue Squad, Inc. (Montross). At the time Montross was formed, a majority of its members formerly had been members of Westmoreland. Montross claims it should share

in this estate because of changes in circumstances since the will was written.

Thus, the issue is whether Westmoreland takes all of the residuary estate or must share it with Montross. The funds at stake exceed $500,000.00.

(The parties have been urged to come to a settlement of this case without Court intervention. These sentiments were expressed to counsel at a hearing on November 15, 1990, and again at a settlement conference on December 27, 1990. Apparently, this is not to be. Counsels' efforts in this regard are appreciated, nonetheless. It would be regrettable indeed if a dispute over so generous a gift became a source of lasting contention between these public service organizations.)

The evidence presented at a hearing on November 15, 1990, was essentially without conflict. Miss Sanford called her lawyer, John L. Melnick, to her home in December, 1977, for the purpose of writing her will. She was then eighty-one years of age. Mr. Melnick wrote out the will in his handwriting at her direction and thereafter carried Miss Sanford to a local bank where it was properly acknowledged and witnessed. Melnick testified that she left the bulk of her estate to the rescue squad because on several occasions, "they had saved her life." They referred to the local telephone directory for assistance in identifying the beneficiary.

Prior to the formation of the Montross squad, the Westmoreland squad had served the lower or easternmost two-thirds of Westmoreland county. From about 1979 until 1988, the Westmoreland squad operated a sub-station in Montross, its main base remaining at Mt. Holly. Until 1988, the dispatcher at Mt. Holly received all calls and dispatched a team from either the Mt. Holly station or the Montross sub-station, depending upon the location of the call and the availability of personnel and equipment. Because of certain inefficiencies in this arrangement and in order to improve service and response time in the central part of the county, some of the members of the Westmoreland group who lived in the Montross area, along with others, organized the Montross squad in 1989 as a new and separate entity. At this time, the area formerly served entirely by the Westmoreland squad was divided.

At present, the citizens of Westmoreland County are served by three rescue squads operating over three approximately equal geographical areas: Colonial Beach Rescue Squad, Inc., serves the upper end of the county; Montross serves the central portion of the county; and Westmoreland serves the lower end. (Colonial Beach Rescue Squad, a named defendant makes no formal claim against the estate.)

Westmoreland claims that it is the only squad which fits the description of the beneficiary in the will; that the fact that its full, proper name was not used does not cause the bequest to fail; that Miss Sanford's intent, as determined from the face of the will and from the facts and circumstances as they existed when she made her will, must control; that the Court is not free to rewrite her will; and that the Montross squad could not have been her intended beneficiary because it was not in existence at the time her will was made. Therefore, claims Westmoreland, it, and no other, is the sole, intended beneficiary.

Montross argues that it now serves a portion of the geographical area formerly served by Westmoreland; that several of its present members not only were long-time members and officers of the Westmoreland squad, but that they actually attended Miss Sanford on emergency calls during such time.

We begin the analysis of these issues by determining the type of bequest the will contains. Volunteer rescue squads are public service organizations. They cannot be created without the approval of the local governing body (§ 15.1-26.01, Code of Virginia). They rely for financial support principally on public donations and contributions from public treasuries. They customarily do not charge for their services. They operate without profit.

Volunteer rescue squads do not exist for the benefit of their members. Their members are volunteers who donate their time and talents for the essential and altogether praiseworthy tasks which are so beneficial to their communities. When contributions are made, from either public or private sources, to a volunteer rescue squad, it is the public that is the real beneficiary of the gift. Any gift which lessens the burden of government, benefits the condition of mankind, or is for the public convenience, is a charitable gift. *Harrison on Wills and Administration*, section 297 *et seq.*, vol. 2, p. 116.

Miss Sanford's testamentary intent was manifestly charitable, and charitable bequests are viewed with peculiar favor by the courts. *Baliles v. Miller*, 231 Va. 48 (1986). Her intent was to benefit, not an entity, but a segment of the Westmoreland community served by that entity.

That segment of the community cannot be identified solely by reference to the language of the will because, in this respect, the will is latently ambiguous. As counsel for Westmoreland correctly argues, it is necessary to look to the facts and circumstances existing at the time the will was executed to ascertain the intended beneficiary. *Harrison on Wills and Administration*, section 258, p. 14; *Johnson v. McCarty*, 202 Va. 49 (1960).

At the time Miss Sanford made her will, the Westmoreland squad served approximately two-thirds of the Westmoreland County area, including those citizens in the Montross area. If that circumstance had not changed, then all these citizens would have benefitted from her bequest. If we look to the facts and circumstances as they existed at the time she made her will, all citizens in the area covered by the Westmoreland squad in 1977 would have benefitted. A portion of those citizens can now benefit only if the Montross squad is included in this bequest. If the Montross territory is excluded, citizens in that area are denied the benefits of Miss Sanford's gift even though she herself did nothing to bring this about. It is true that her home is located in the area served by the Westmoreland squad, but this circumstance alone affords no basis to believe that she would want to exclude her neighbors living in the Montross area.

If the doctrine of *cy pres* were applicable here, where there is in the will an expression of a general charitable intent but the particulars are absent, the court must apply the funds to those charitable objects as seem most nearly in accord with the donor's intent. Code of Virginia, Section 55-31.

For the foregoing reasons, the Court concludes that this is a charitable bequest, intended to benefit those citizens of the area served by the Westmoreland squad in 1977. This requires that these citizens presently served by Montross now be included. Therefore, the Westmoreland squad *and* the Montross squad should share this bequest.

Two cases cited by counsel for Montross support this analysis. In *Board of Education of Fairfield Township v. Ladd*, 26 Ohio St. 210 (1875), the testator bequeathed a fund to be applied to the youth of the Fairfield Township. After the will was executed but before the testator died, a portion of the township was annexed and made a part of another township. The issue before the Supreme Court of Ohio was "whether the testator . . . refers to Fairfield Township as it existed territorially at the time of the execution of the will, or whether the reference is to the township as it might thereafter be constituted." In *Ladd*, as in this case, the original beneficiary claimed the entire fund. The Supreme Court of Ohio, in holding that the fund should be divided between the two townships, noted that the Fairfield Township was referred to in the will as an existing territorial organization, not as the beneficiary of the charity but as a means of ascertaining such beneficiaries when the time should arrive for its administration. Said the Court, "the only effects of the division seems to be that two agencies of a like nature are required to execute the trust instead of one." *Id.* at 231.

In *Diocese of East Carolina v. Diocese of North Carolina*, 102 N.C. 442, 9 S.E. 310 (1889), the North Carolina Supreme Court had before it the disposition of a bequest to the Diocese of North Carolina. Before the testator died, the diocese was divided. The diocese named in the will claimed the entire fund, but the Court held otherwise ruling that the essential question was the intention of testator interpreted in the light of circumstances existing at the time the will was executed. Here the Court felt the testator could not have intended or contemplated a subdivision of the diocese. The trustees for the diocese actually named in the will claimed that it had continued to exist under that name and for that reason should receive the entire fund. The North Carolina Supreme Court found that although the diocese existed in name, it was not the same in territorial extent. The division here was primarily a matter of administrative convenience, and the Court concluded that the proper way to carry out the testator's intent was to divide the fund between the two dioceses formed from the territory encom-

passed by the Diocese of North Carolina at the time the will was executed.

We turn next to the question of how these funds should be apportioned between the two squads. Each squad has three units. From January 1, 1990, to November 15, 1990, the Westmoreland squad responded to 300 calls, and the Montross squad responded to 257 calls. Presumably, this is a typical and fair representation of the work load of the two squads. On a map showing the division of the service areas, introduced in evidence as Plaintiff's Exhibit 1, the area served by the Westmoreland squad appears to be slightly larger than the area served by the Montross squad. No evidence was introduced to show the comparative populations of the two areas. Indeed, such information is likely not available. Therefore, in the absence of a more definitive basis for making such a judgment, we conclude that the Westmoreland squad should be entitled to fifty-five percent of the fund, and the Montross squad should be entitled to forty-five percent of the fund.

An order will be entered directing the executor to distribute fifty-five percent of the residuary estate of Martha Virginia Sanford to Westmoreland County Volunteer Rescue Squad and forty-five percent to the Montross Volunteer Rescue Squad, Inc.